M.R. v D.R. (2024 NY Slip Op 50295(U))

[*1]

M.R. v D.R.

2024 NY Slip Op 50295(U)

Decided on March 19, 2024

Supreme Court, Westchester County

Hyer, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 19, 2024
Supreme Court, Westchester County

M.R., Plaintiff,

against
D.R., Defendant.

Index No. 66602/2020

James L. Hyer, J.

Basic Background & Procedural History

The parties married on December 4, 1983, in Randolph, Massachusetts, in a religious ceremony. Together, they have no unemancipated children and they expect no further children of the marriage.
Plaintiff commenced this action with the filing of a Summons, Verified Complaint, and ancillary documents on December 28, 2020. Plaintiff's Verified Complaint asserts one cause of action for divorce pursuant to New York State Domestics Relations Law § 170(7) in that the parties' marriage has broken down irretrievably for a period in excess of six months requesting that a Judgment of Divorce be entered granting the following relief: (1) granting Plaintiff a Judgment of absolute divorce against Defendant on the ground of Irretrievable Breakdown of the Marriage; (2) granting Plaintiff a distributive award and an equitable distributive share of the parties' marital property; (3) declaring Plaintiff's separate property; (4) granting Plaintiff an equitable share of the increase in value of Defendant's separate property; (5) directing Defendant to maintain or obtain life insurance coverage on his life for Plaintiff's benefit; (6) directing Defendant to pay the cost of all legal, expert, and appraisal fees incurred as a result of this divorce action; and (7) granting to Plaintiff such other and further relief as to this Court may seem just, equitable and proper.
On February 16, 2021, Plaintiff filed a Request for Judicial Intervention, seeking the scheduling of a Preliminary Conference. On February 18, 2021, a Court Notice was issued, scheduling a Preliminary Conference to be held at 11:30 a.m. on March 11, 2021.
On March 2, 2021, Plaintiff filed an Affidavit of Service, indicating that on January 27, 2021, Defendant was served with the following: (1) Summons; (2) Verified Complaint; (3) Domestic Relations Law § 255 Notice; and (4) Domestic Relations Law § 236(B)(2) Notice of Guideline Maintenance.
On March 9, 2021, Plaintiff filed: (1) an Affidavit of Service, indicating that on February 17, 2021, Defendant was served with the Request for Judicial Intervention; (2) an Affidavit of Service, indicating that on February 22, 2021, Defendant was served with a Preliminary Conference Notice; and (3) an Affidavit of Service, indicating that on March 5, 2021, Defendant was served with a draft Preliminary Conference Stipulation/Order and draft Preliminary Conference Stipulation With Respect to Grounds.
On March 10, 2021, Plaintiff filed her Statement of Net Worth, including a Retainer Agreement between Plaintiff and Plaintiff's then-legal counsel, and her 2019 Federal and New York State Income Tax Returns.
On March 11, 2021, Court Attorney Referee Janet Gandolfo held a Preliminary Conference and issued a Report of Attorney Referee, which provided:
Defendant pro se did not appear for the conference. Plaintiff's counsel states that prior to the commencement Defendant had retained an attorney and the parties were in settlement discussions. However, Defendant no longer has an attorney and is now in default for failing answer the complaint.
Plaintiff is seeking a default judgment and may further be looking for a stay freezing the parties' financial accounts. Plaintiff states that she fears that Defendant is depleting the accounts.
Plaintiff's counsel was directed to draft a Rule E detailing the accounts and submit it for approval.
Adjourned to June 4, 2021 at 9:30 for CPO.
On March 15, 2021, Plaintiff's then-counsel filed a letter with the Court requesting that the Preliminary Conference be rescheduled to permit Defendant to appear, annexing e-mails between Plaintiff's then-counsel and pro se 
Defendant. Within these initial e-mails, Defendant demonstrated a hostile litigation posture that would persist throughout this action, asserting to Plaintiff's then-legal counsel, "Clearly, you don't like a level playing field," and directing the attorney to "turn off the meter."
On March 23, 2021, Defendant's then-legal counsel filed a Notice of Appearance. On April 22, 2021, Defendant filed a Verified Answer with Counterclaim (hereinafter "Answer"). The Answer asserted only one counterclaim that sought the entry of a judgment of divorce dissolving the parties' marriage pursuant to New York State Domestic Relations Law § 170(7) in that the parties' marriage has broken down irretrievably for a period in excess of six months requesting that a Judgment of Divorce be entered granting the following relief: (1) divorcing the parties and dissolving the marital relationship which has heretofore existed; (2) awarding Defendant spousal maintenance; (3) directing Plaintiff to maintain medical and dental insurance coverage for the benefit of Defendant; (4) awarding Defendant exclusive occupancy of the marital residence; (5) awarding Defendant exclusive use and possession of the contents of the marital residence; (6) awarding Defendant equitable distribution of marital property, including a distributive award to Defendant if required or appropriate to effect such equitable distribution; (7) declaring Defendant's separate property; and (8) awarding Defendant such other and further relief as to the court may seem just and proper, together with the costs and disbursements of this action.
On May 24, 2021, the Court entered two Real Property Appraiser Appointment Orders, each appointing John Saluto of Hudson Property Appraisals, Inc., to value the following: (1) 1 Lexington Avenue, [redacted] (hereinafter "1 Lexington"), at present value, with each party providing payment of half of the appraisal cost subject to reallocation at trial or further order of the Court; and (2) 7 Lexington Avenue, [redacted] (hereinafter "7 Lexington"), at present value and completed value, with each party providing payment of half of the appraisal cost subject to reallocation at trial or further order of the Court.
On June 9, 2021, Plaintiff's then-counsel filed a letter requesting a Pre-Motion Conference, asserting the following:
I am writing to request that the June 17, 2021 Court appearance be deemed a Pre-Motion conference with regard to the appointment of a Guardian 
Ad Litem for D.R., for a direction that Plaintiff be appointed the Receiver of the marital residence and that she be authorized to take all steps necessary to prepare the home for sale and place the marital residence on the real estate market for sale, that an Order be issued freezing the Citibank line of credit under the corporation [redacted] (D.R. has sole control over this line and has borrowed $84,000 against same and my client has to make the minimum monthly payments or the line will be in default) and for an award of counsel fees. I have enclosed a Rule E Motion Compliance Sheet in the event one is necessary to effectuate my request.
D.R. has been the subject of involuntary admissions to the psychiatric wards at both Phelps Memorial Hospital and Westchester Medical Center, the most recent involuntary admission having taken place on or about May 30, 2021. As a result of that admission, D.R. remains in Westchester Medical Center at this time. There have been other hospitalizations prior to commencement of the divorce action.
D.R. has consistently demonstrated an unwillingness to comply with prior counsel and, upon information and belief, D.R. has allowed the former marital residence to fall into a state of decay, has repeatedly been the subject of calls by neighbors to the [redacted] Police Department resulting in the two recent involuntary admissions, has been seen in public intoxicated and high on marijuana, has been diagnosed as bipolar, and has chosen not to cooperate with recommended treatment during the two involuntary admissions including the current admission where he is refusing medication and refusing psychiatric sessions.
D.R. has failed to take the necessary steps to submit a Statement of Net Worth to this Court. It is my belief that Mr. Salvi has been unable to move forward with completing the Statement of Net Worth and discovery due to a lack of cooperation from D.R.. My client has been compelled to incur additional and avoidable legal fees as a result of D.R.'s lack of cooperation and delay. We have had to serve Subpoenas instead of receiving documents in the ordinary course of discovery, have been denied even the simple and basic information from a sworn Statement of Net Worth, and have been subject to delays as a result of D.R.'s obstinance, arrogance and refusal to cooperate.
In any event, I would request that the June 17th appearance be treated as a pre motion conference so that we can request appropriate relief from the court as a result of D.R.'s circumstances and conduct.
Thank you for your consideration in this matter.
On July 1, 2021, Plaintiff's then-counsel filed a Reply to Counterclaim and an Order to Show Cause (hereinafter "Motion Sequence 
#2), requesting that an Order be granted:
(1) Pursuant to CPLR §§1201 and 1202, for an Order appointing an independent Guardian for Defendant for all purposes with respect to the pending divorce action, and that Defendant promptly submit to a mental capacity examination by a psychiatrist selected by the Court;
(2) Pursuant to CPLR §§ 3124 and 3126, compelling Defendant to produce his fully executed Statement of Net Worth and documentary discovery as previously directed by this Court, and to the extent Defendant fails to do so, precluding Defendant from submitting any evidence in the trial of this matter and/or holding Defendant in default and setting this matter down for an inquest;
(3) With respect to two lines of credit at Citibank in the name of [redacted] and in the names of the parties, directing that Defendant's access to said lines of credit be frozen in all respects, with an appropriate Order issuing to Citibank from this Court confirming said restrictions upon the Defendant's access, so that Defendant may not further encumber, borrow from, or in any way access or withdraw any funds from said lines of credit now or in the future in order to protect the account;
(4) Directing Defendant to pay to Plaintiff reasonable counsel fees in the amount of no less than Twenty-Five Thousand Dollars ($25,000) incurred both in connection with the present application and as a result of Defendant's conduct in refusing to comply with this Court's directives to submit his sworn Statement of Net Worth and to produce required financial discovery documents; and
(5) Awarding Plaintiff such other and further relief as to this Court may be just and proper. 

In addition, Plaintiff further requested that pending the hearing and determination of the motion, and further Order of this Court, it is:

 ORDERED that Citibank NA is hereby directed to freeze Defendant's access to: (1) the [redacted] LLC line of credit (account number [redacted]); and (2) the checking plus line of credit associated with the parties' personal, joint Citigold account [redacted], such that no withdrawals or borrowing of any kind shall be allowed by Defendant from the date this Order is served upon Citibank NA, as set forth hereinbelow, until further Order of this Court.
In support of Motion Sequence #2, Plaintiff and her son, J.R., submitted Affidavits in Support, and Plaintiff's then-legal counsel filed an Affirmation in Support which asserted the following support for the appointment of a guardian ad litem for Defendant:

 7. This is the second attorney to withdraw from Defendant's representation. 
 Prior to the commencement of the divorce action, as outlined in Plaintiff's 
 Affidavit, Lawrence Braunstein, Esq. represented the Defendant for 
 approximately 4 months. I had several telephone calls with Mr. Braunstein 
 and we exchanged several emails in an effort to ascertain the assets of the 
 parties and to work toward a 50/50 property division. It is my understanding 
 that Mr. Braunstein had difficulty obtaining Defendant's cooperation in 
 providing financial information, and in basic communications with the 
 Defendant. Ultimately, Mr. Braunstein decided he could not represent the 
 Defendant and he withdrew from the case at about the time we served 
 Defendant with the pleadings in or about January, 2021.

 8. We are seeking the present relief due to Defendant's failure and refusal, or inability, to cooperate with his own counsel, his threats directed at the Plaintiff, his behavior directed toward third parties, his waste of marital assets, his continued incurrence of debt on the marital lines of credit, the consistent patterns of refusal or inability to comply with requirements imposed by others, his failure to comply with directions of the Court concerning financial disclosure and the submission of a Statement of Net Worth, and the reality that, unless this Court intervenes, the Defendant will be directionless and the Plaintiff will continue to suffer as a result of the delays caused by Defendant's mental health issues.
* * *
10. Plaintiff commenced this divorce action to dissolve the marriage between the parties and to have the Court effectuate a division of marital assets, and for the other relief sought. Defendant, who is functional in certain respects, did not want this divorce. Defendant has effectively prevented Plaintiff from making progress in prosecuting this matter, either intentionally or due to mental illness. Defendant has been diagnosed as bipolar, refuses to seek treatment on his own, and when admitted 
involuntarily twice in 2021 alone to two different psychiatric wards at local hospitals in Westchester, continued to refuse treatment or to take prescribed medication. Furthermore, as fully described in Plaintiff's Affidavit, Defendant has had multiple interactions with the police as a result of complaints filed against him as a result of his erratic and violent behavior.
11. I am not in a position to know whether Defendant is really unable to assist in his own representation, or if he has consciously decided to punish the Plaintiff for bringing this divorce action by delaying this action, depleting the marital estate, and driving up her legal fees. If it is the former, in the sense that he has serious mental health issues, and a mental capacity examination confirms he needs a third party to take over decision making on his behalf, then the appointment of an independent Guardian ad litem will ensure that we can proceed in this action in an orderly fashion that protects 
both parties. If it is the latter, and he has the mental capacity to proceed without a Guardian ad litem, then we will know that Defendant's obstructionist behavior is willful and the Court can apply appropriate remedies and penalties.
On July 1, 2021, Defendant's then-counsel filed an Order to Show Cause (hereinafter "Motion Sequence #1"), requesting that an Order be granted: (1) Pursuant to CPLR § 321(b) and the New York Rules of Professional Conduct 1.16 (22 NYCRR § 1200.16) relieving Frank J. Salvi, Esq. of The Law Office of Frank J. Salvi, P.C., as counsel of record and staying this action for thirty (30) days to enable the Defendant herein to obtain new counsel; and (2) Such other and [*2]further relief as to this Court seems just and proper.
On July 8, 2021, the Court conformed Motion Sequence #1 and required,
inter alia: (1) Motion Sequence #1, with exhibits, be served on Defendant by July 9, 2021; (2) Motion Sequence #1 be served, without exhibits, to Plaintiff's then-counsel by July 9, 2021; and (3) the return date be scheduled for August 6, 2021, with no appearances required. Motion Sequence #1 was withdrawn on August 27, 2021.
On July 8, 2021, the Court conformed Motion Sequence #2, requiring: (1) Motion Sequence #2 be served on Defendant's counsel by July 9, 2021; (2) Answering papers be served and filed by July 22, 2021; and (3) the return date be scheduled for July 26, 2021.
On July 8, 2021, Plaintiff's counsel filed proofs of service of Motion Sequence #2, and Defendant's counsel filed proofs of service of Motion Sequence #1.
On August 27, 2021, the parties and counsel appeared before the Court. The Court (Koba, J.) entered a decision on the record related to Motion Sequence #2, resolving the outstanding issues without appointing a guardian ad litem for Defendant and directing the parties to continue discovery. 

On September 2, 2021, Plaintiff filed a Consent to Change Attorney that reflected current counsel as her incoming counsel.
On January 3, 2022, Plaintiff's counsel filed a letter requesting a conference to address Defendant's alleged noncompliance with the automatic orders.
On January 18, 2022, Defendant's then-counsel filed an Order to Show Cause (hereinafter "Motion Sequence #3), seeking to be relieved. On January 20, 2022, the Court conformed Motion Sequence #3, requiring: (1) Motion Sequence #3 be served, with exhibits, on Defendant by January 27, 2022; (2) Motion Sequence #3 be served, without exhibits, on Plaintiff's counsel by January 27, 2022; and (3) a scheduled return date for February 15, 2022, with no appearances required. On January 22, 2022, Defendant's then-counsel filed proofs of service of Motion Sequence #3.
On January 28, 2022, Plaintiff's counsel requested a Pre-Motion Conference, asserting the following:
This firm represents the Plaintiff, M.R. in the above-referenced matter. The Defendant, D.R. is currently represented by Frank Salvi, Esq., however, Mr. Salvi has an Order to Show Cause to be relieved as counsel pending with this Court. We write to request a pre-motion conference with respect to the Defendant's consistent violation of the automatic orders and refusal to provide discovery, including but not limited to a Net Worth Statement and response to discovery demands as was directed by Referee Gandolfo during the last conference.
The instant action was initiated on December 28, 2020. In September 2021, our office filed a consent to change attorney on behalf of Plaintiff. To date, the Defendant has not produced any discovery. Equally concerning, the Defendant has consistently withdrawn and transferred significant marital monies and has been trading, selling and buying stock on margin from the parties' joint investment account. In an effort to avoid seeking the Court's intervention, on October 1, 2021, our office sent a good faith letter to Defendant's counsel advising of Defendant's violation of the Automatic Orders regarding the parties' marital funds and calling for an accounting of any funds that have been withdrawn/cashed out/transferred and a return of funds to an account in the parties' joint name. On January 4, 2022, our office sent another letter to opposing counsel in a good faith attempt to request outstanding discovery and again address [*3]the Defendant's continued violation of the Automatic Orders pertaining to the transfer, withdrawal and trading of the parties' marital funds.
It does not appear that the Defendant has any intention on cooperating with this action. Based on the continued obstructive behavior by the Defendant, this office has no other option than to seek court intervention. We will be seeking an Order precluding Defendant from testifying or presenting evidence demanded by Plaintiff and for a negative inference to be drawn, awarding Plaintiff legal fees, costs and disbursements and sanctioning Defendant in the form of attorney's fees and costs awarded to Plaintiff in connection with Defendant's self-serving tactics.
The courtesies of the Court are greatly appreciated.
On February 24, 2022, the Court (Quinones, J.) entered a Decision and Order on Motion Sequence #3 wherein it was ordered that: (1) the motion was granted and the Law Office of Frank J. Salvi, PLLC was relieved as Defendant's counsel; (2) movant was directed to serve a copy of the Decision and Order with notice of entry upon Defendant and all parties within 10 days of entry; (3) the action was stayed for 30 days from the date of entry of the Decision and Order; (4) Defendant should inform the Court and all counsel in writing within the 30-day period as to new counsel's name and address, or his election not to retain new counsel and to proceed 
pro se; (5) the parties and counsel were to appear for a conference on April 11, 2022, at 12:00 p.m.
On March 2, 2022, Defendant's former counsel filed a Notice of Entry of this Decision and Order and proof of service. On March 31, 2022, Defendant's new counsel, Constantino Fragale, Esq., filed a Notice of Appearance.
On April 5, 2022, a Court Notice was issued, converting the April 11, 2022 appearance to a virtual appearance.
On April 13, 2022, Defendant filed his Statement of Net Worth.
On April 20, 2022, Defendant's then-counsel requested a pre-motion conference to seek 
pendente lite relief. On May 23, 2022, the parties and their then-legal counsel executed a Stipulation wherein the following was recited and agreed to:
IT IS HEREBY STIPULATED AND AGREED by and between the parties to the above-captioned divorce action that plaintiff and Defendant agree to partially distribute the marital asset herein, namely, the Joint Fidelity Investment Account No. [redacted] (the "Account"), in accordance with the following terms:
1. The parties will share equally the market value of the holdings of the Account (hereinafter defined as the "Market Value") as of May 23, 2022, with the Plaintiff receiving in cash 50% of its Market Value as of May 23, 2022; and thereafter in consideration of the foregoing, the Account will be simultaneously transferred and/or titled solely to Defendant which he would use going forward without any restrictions for his sole benefit. Plaintiff shall sign simultaneously the Form attached herewith as Exhibit "A", which Defendant's attorney shall hold in escrow until Plaintiff's counsel confirms receive of the cash equivalent to 50% of the Market Value of the Holdings as of the Market Value on May 23, 2022.
2. Defendant will be solely responsible for any and all tax consequences associated with the [*4]Account, including, but not limited to any capital gains, as a result of any transactions performed following the date of filing of the divorce action; and Defendant will be solely responsible for the net debit balance. Defendant indemnifies Plaintiff and holds her safe, harmless and satisfied with regard to any and all liabilities associated with this Account including but not limited to any margin debt, the net debit balance, tax consequences and fees associated with this Account.
3. In Consideration for the foregoing division of the Account, the Defendant shall not file any pendente lite spousal support or legal fees application 
pendente lite.
4. Plaintiff does not, in any way, waive her right to the equitable distribution of the Account and remains entitled to pursue the recovery of any transfers made from this Account without her written permission including any withdrawals, and/or her claim for a wasteful dissipation of the Account and/or to be made whole for any losses associated with this Account.
5. Neither party waives any legal or equitable rights or defense that he/she may have asserted or otherwise might assert in connection with the adjudication of the equitable distribution of the Account except to the extent set forth herein and neither party waives any legal or equitable rights that he/she may have asserted or otherwise might assert in conjunction with the equitable distribution of any other marital asset at trial except as set forth herein.
On June 2, 2022, Plaintiff wrote to the Court requesting an emergency conference in response to certain actions taken by Defendant purportedly in violation of the Stipulation.
On June 6, 2022, the Court issued a Discovery Order, providing the following:
1. Defendant has served discovery demands upon Plaintiff. Plaintiff shall comply with those discovery demands on or before June 13, 2022.
2. Plaintiff shall serve discovery demands upon Defendant's new counsel on or before June 20, 2022. Defendant shall comply on or before July 15, 2022.
3. Plaintiff shall depose Defendant on July 18, 2022 commencing at 9:30 a.m. Plaintiff requested to do the deposition virtually.
4. Defendant shall depose Plaintiff on July 26, 2022 commencing at 9:30 a.m. Defendant reserved the right to do the deposition in person.
5. There is a business, [redacted] LLC, for which the Court will issue a separate order of appraisal subject to discovery responses owed from Plaintiff (#l above). Defendant suggests that M.R. LLC, which Plaintiff founded in 2021, is intertwined with the [redacted] LLC. At the next compliance conference, the Court will determine the need for the issuance of the appraisal order. If an appraisal order is issued, the parties shalt equally share in the appraisal. Purpose of the appraisal: the value of the business and the income stream.
6. Parties shall contact John Saluto on or before June 8, 2022 to update the appraisals of the two properties. Defendant shall pay 100% of the appraisals given Plaintiff's representation that she paid 100% of the initial appraisals despite the Orders directing that the parties share equally. The parties shall obtain the update appraisals prior to the in-person settlement conference.
The Court also directed the parties to appear for an in-person settlement conference on July 8, 2022 at 10:30 a.m.
On July 8, 2022, the Court issued a Discovery Order, providing the following:
l. Plaintiff shall depose Defendant on September 20, 2022, commencing at 10:00 a.m. Plaintiff requested to do the deposition virtually. Plaintiff will provide the link to the exhibits by 5:00 p.m. the day before. This does not preclude Plaintiff from introducing new exhibits during the deposition which were not provided in advance.
2. Defendant shall depose Plaintiff on September 23, 2022 commencing at 10:00 a.m. Defendant requested to do the deposition virtually. Defendant will provide the link to the exhibits by 5:00 p.m. the day before. This does not preclude Defendant from introducing new exhibits during the deposition which were not provided in advance.
3. The parties represented that [redacted] LLC is closed, and appraisal not necessary.
4. Defendant may file the appropriate application to appraise M.R. LLC, which Plaintiff founded in 2021. Defendant suggests M.R. LLC is intertwined with the [redacted] LLC.
The Court also directed the parties to appear for a virtual compliance conference on September 30, 2022 at 9:30 a.m. After the September 30, 2022, the Court issued a Discovery Order, providing that:
1. Plaintiff shall serve post-deposition demands on or before October 14, 2022; Defendant shall comply on or before November 11, 2022. Defendant's failure to provide the requested documents will result in preclusion and favorable inference to the Plaintiff.
2. The parties shall appear for a virtual compliance conference on November 28, 2022 at 3:00pm.
On November 22, 2022, Plaintiff's counsel filed, with Notice of Settlement, a proposed Order, "preclude[ing] Defendant from proffering any previously undisclosed evidence (documents or otherwise) at trial with a favorable inference to Plaintiff." Plaintiff submitted this proposed Order based on an assertion that Defendant failed to provide responses to Plaintiff's Post Deposition Discovery Demands and Supplemental Demand pursuant to court orders. The Court entered the signed Order on November 30, 2022.
On January 3, 2023, Motion Sequence #4 was filed and administratively closed on March 8, 2023.
On January 3, 2023, Plaintiff's counsel filed an Order to Show Cause (hereinafter "MotionSequence #5"), requesting an Order:
(a) Finding Defendant, D.R. in willful violation of the Automatic Orders;
(b) Pursuant to DRL § 236(B)(2), restraining and enjoining Defendant, his agents, employees and/or any attorneys from transferring, encumbering, assigning, removing, withdrawing or in any way disposing of, without the consent of the Plaintiff in writing, or by order of the court, any property (including, but not limited to, real estate, personal property, cash accounts, stocks, mutual funds, bank accounts, cars and boats) individually or jointly held by the parties;
(c) Pursuant to DRL § 236(B)(2), restraining and enjoining Defendant, his agents, employees, and/or attorneys, from transferring, encumbering, assigning, removing, withdrawing or in any way disposing of any tax deferred funds, stocks or other assets held in any individual retirement accounts, 401K accounts, profit sharing plans, Keogh accounts, or any other pension or retirement account, and the Defendant shall further refrain from applying for or requesting the payment or retirement benefits or annuity payments of any kind, without the consent of the Plaintiff in writing, or upon further order of the court;
(d) Pursuant to DRL § 236(B)(2), restraining and enjoining Defendant, his agents, employees, and/or attorneys, from incurring unreasonable debts hereafter, including, but not limited to, further borrowing against any credit line secured by the family residence or any marital property, further encumbering any marital assets or using jointly titled credit cards or cash advances against jointly tilted credit cards;
(e) Pursuant to CPLR § 6401(a) ordering the appointment of Plaintiff as Receiver of all marital property, to wit: 1 Lexington Avenue, [redacted] and 7 Lexington Avenue, [redacted] to effectuate the sale and/or rental of both properties and to oversee the management of both properties including but not limited to any construction and/or repairs and/or maintenance to ready the real property for sale and/or rent, with all related expenses to be 100% reimbursed to Plaintiff from Defendant;
(f) Permitting Plaintiff to immediately enter all marital real property, to wit, 1 Lexington Avenue, [redacted] and 7 Lexington Avenue, [redacted] with a police escort, to assess the state of said properties and to continue to be able to access such properties in the capacity of Receiver and for Defendant to provide Plaintiff with all keys to the marital real property and forbidding Defendant from changing or altering any locks;
(g) Pursuant to Domestic Relations Law §237(a), an Order awarding Miller Zeiderman LLP interim counsel fees in the sum of $150,000 on behalf of Plaintiff, without prejudice to file for additional fees/costs;
(h) Directing Defendant to immediately comply with the May 26, 2022 Stipulation to Partially Distribute Marital Assets;
(i) Granting such other and further relief as the Court may deem just and proper.
On January 6, 2023, Motion Sequence #5 was conformed, directing that, 

inter alia: (1) Motion Sequence #5 be served on Defendant's counsel by NYSCEF filing; (2) Answering papers be served and filed by January 13, 2023; (3) Reply papers be served and filed by January 18, 2023; and (4) the return date be scheduled for January 19, 2023, at 11:30 a.m.
On February 15, 2023, the Court (Quinones, J.) entered a Decision and Order on Motion Sequence #5, ordering that:
(1) Plaintiff s Emergency Order to Show Cause is granted to the extent set forth below;
(2) Defendant, his agents, employees and/or any attorneys are hereby restrained from transferring, encumbering, assigning, removing, withdrawing or in any way disposing of, without the consent of Plaintiff in writing, or by order of the Court, any property (including, but not limited to, real estate, personal property, cash accounts, stocks, mutual funds, bank accounts, cars and boats) individually or jointly held by the parties, or until further order of this Court;
(3) Defendant, his agents, employees and/or any attorneys are hereby restrained from transferring, encumbering, assigning, removing, withdrawing or in any way disposing of any tax-deferred funds, stocks or other assets held in any individual retirement accounts, 40lK accounts, profit sharing plans, Keogh accounts, or any other pension or retirement account, and Defendant shall further refrain from applying for or requesting the payment of retirement benefits or annuity payments of any kind, without the consent of Plaintiff in writing, or until further order of the Court;
(4) Defendant, his agents, employees and/or any attorneys are hereby restrained from incurring unreasonable debts hereafter, including, but not limited to further borrowing against any credit line secured by the family residence or any marital property, further encumbering any marital assets or using jointly titled credit cards or cash advances against jointly titled credit cards until further order of the Court;
(5) Defendant shall open one bank account for the sole purpose of depositing and utilizing Defendant's social security checks and Defendant's counsel shall provide the bank account information, including the name of the financial institution and the full bank account number, to Plaintiff's counsel within five (5) business days of the account's opening — that new account shall not be subject to the foregoing restraints in order to ensure that Defendant has access to his social security checks/deposits and the only funds that shall be deposited into that new account [*5]shall be Defendant's social security checks/deposits;
(6) Defendant shall immediately reinstate Plaintiff's access to the Fidelity Investment Account [redacted], if it exists;
(7) Evan Wiederkehr, Esq. is appointed, with the usual powers and directions of a financial Receiver (hereinafter the "Financial Receiver"), for the benefit of assessing the marital finances and payment of bills now due and unpaid or to become due during the pendency of this action;
(8) all costs associated with the appointment of the Financial Receiver shall be paid from marital assets and shall be allocated against the parties' respective shares of equitable distribution;
(9) the Financial Receiver shall evaluate the parties' May 26, 2022 Stipulation to Partially Distribute Marital Assets to determine if Plaintiff received her share in accordance with the May 26, 2022 Stipulation;
(10) Plaintiff, M.R., is appointed as Receiver of the following marital real property: (a) 1 Lexington Avenue, [redacted], and (b) 7 Lexington Avenue, [redacted], to preserve the properties and to oversee the management of both properties including but not limited to, renting them, any construction and/or repairs and/or maintenance to ready the real property for sale and/or rent with all related expenses to be shared by the parties subject to the further Court order or stipulation of the parties;
(11) Plaintiff shall have immediate access to enter 1 Lexington Avenue, [redacted] and 7 Lexington Avenue, [redacted] with a police escort to assess the state of said properties and to continue to be able to access such properties in the capacity of Receiver;
(12) Defendant shall provide Plaintiff with all keys to 1 Lexington Avenue, [redacted] and 7 Lexington Avenue, [redacted] and Defendant shall not change or alter any locks and/or security systems at 1 Lexington Avenue, [redacted] and 7 Lexington Avenue, [redacted];
(13) Defendant shall cooperate with providing Plaintiff with all bills associated with the carrying charges related to 1 Lexington Avenue, [redacted] and 7 Lexington Avenue, [redacted]. Plaintiff s attorneys shall hold the property deeds in escrow until further Court order or stipulation of the parties;
(14) Plaintiff's application for an award of interim counsel fees to be payable by Defendant is granted to the extent that Plaintiff is awarded $35,000 in counsel fees for having to make the instant application payable by Defendant's attorneys as set forth below (hereinafter "Plaintiff s Fee Award"), with leave to apply for additional fees, if necessary;
(15) Plaintiff s Fee Award shall be paid from marital assets and shall be allocated against Defendant's share of equitable distribution;
(16) the parties shall cooperate with the Financial Receiver, upon reasonable notice, to inspect and appraise 1 Lexington Avenue, [redacted] and 7 Lexington Avenue, [redacted];
(17) the parties shall cooperate with providing the Financial Receiver with all documentation related to their assets as reflected in their respective statements of net worth. These include, without limitation, 1 Lexington Avenue, [redacted] and 7 Lexington Avenue, [redacted], retirement plans, artwork, jewelry in Plaintiff s possession;
(18) the Financial Receiver shall report to the Court the availability of marital assets to be allocated for Plaintiff's Fee Award within 45 days of the date of this Order on Motion; and
(19) any other relief sought in Plaintiff s Order to Show Cause not specifically addressed in this Order is denied without prejudice.
On March 10, 2023, the Court (Quinones, J.) entered an Order, providing:
WHEREAS, pursuant to the Decision and Order (Motion sequence #5) in the above captioned matter, dated February 15, 2023, Evan Wiederkehr, Esq. was appointed by this Court to serve as Financial Receiver (the "Financial Receiver") on consent, to assess the marital finances and payment of bills, now due, unpaid, and to become due for the parties in the above-captioned matter;
NOW, upon application of the Financial Receiver, it is hereby
ORDERED, that any financial institution that maintains an account in the name of, or for the benefit of, M.R. (SSN: xxx-xx-xxxx) or D.R. (SSN: xxx-xx-xxxx), shall provide directly to Evan Wiederkehr, Esq., any and all financial information, including, but not limited to, account statements that would be available to either M.R. and/or D.R., with any need for further consent, authorization or Court Order.
On March 14, 2023, an Order was entered indicating that this matter has been reassigned to the undersigned, providing a deadline to file the Note of Issue by March 24, 2023, or in the [*6]event no such filing occurred, a Status Conference would be held on March 28, 2023, at 2:00 p.m.
On March 23, 2023, Plaintiff filed that Note of Issue.
On April 6, 2023, this Court entered an Order, referring this matter to Court Attorney Referee Erin Guvan to hear and report.
On April 28, 2023, Defendant's then-counsel filed an Order to Show Cause (hereinafter Motion Sequence #6"), requesting that an Order be entered granting the following relief:
(1) Pursuant to CPLR § 321(b)(2) and the New York Rules of Professional Conduct 1.16(b)(4) (22 NYCRR § 1200, Rule 1.16(c)(4)) relieving Costantino Fragale, Esq. and Maker Fragale & Di Costanzo, LLP, as counsel of record and staying this action for sixty (60) days to enable the Defendant herein to obtain new counsel; and
(2) Such other and further relief as to this Court seems just and proper.
In support of his application, Defendant's then-counsel submitted an Affirmation, providing in part, that:
4. On or about February 21, 2023, Defendant terminated my services and retrieved the file pertaining to this action in its entirety. Exhibit A, annexed herewith. At that time, the attorney-client relationship had degenerated beyond repair.
5. Pursuant to plaintiff's request, the parties and their respective counsel, and the Court-appointed Receiver, Evan Wiederkehr, appeared before the Court on March 9, 2023, before the Honorable Thomas Quinones. Both your Affirmant and [D.R.] represented in open court that my services had been terminated by [D.R.]; and that a notice of substitution by new counsel was forthcoming. However, to date, I have not been contacted by any attorneys and I do not believe [D.R.] has retained one. Consequently, your Affirmant is compelled to move for leave to withdraw as attorney for Defendant.
6. [D.R.] has the means to be represented in this action going forward.
On May 1, 2023, the Court conformed Motion Sequence #6 and directed that: (1) Motion Sequence #6 be served on Defendant and Plaintiff's counsel by May 2, 2023; (2) Answering papers be served by May 3, 2023; (3) Reply papers be served by May 4, 2023; and (4) the return date be scheduled for May 5, 2023.
That same day, the Court entered an Order, directing that: (1) the April 5, 2023 Hear and Report Order was vacated; (2) any previously scheduled trial dates were adjourned; and (3) parties and counsel shall appear before the undersigned on Thursday, May 25, 2023 at 11:30 a.m. in person in Courtroom 1003 for a status conference.
On May 5, 2023, the Court entered a Decision and Order, granting the application to the extent Defendant's then-counsel was relieved. The Court directed the parties and counsel to appear in person on May 25, 2023, at 11:00 a.m. for a conference.
On May 16, 2023, the Receiver requested updated real estate appraisals for 1 Lexington [*7]and 7 Lexington. On May 22, 2023, the Court entered two Real Property Appraiser AppointmentOrders, each appointing John Saluto of Hudson Property Appraisals, Inc., to value the following:(1) 1 Lexington, at present value, with each party providing payment of half of the appraisal cost subject to reallocation at trial or further order of the Court; and (2) 7 Lexington, at present value, with each party providing payment of half of the appraisal cost subject to reallocation at trial or further order of the Court.
On May 30, 2023, Plaintiff's counsel served a proposed Money Judgment noticed for settlement, providing:
WHEREAS, on or about January 3, 2023, Plaintiff, M.R., filed an Emergency Order to Show Cause seeking, inter alia, interim counsel fees in connection with the matrimonial action (MS #5);
WHEREAS, the Court issued a Decision and Order dated February 15, 2023, (the "Decision and Order") (NYSCEF DOC #159), which directed, inter alia:
ORDERED, that Plaintiff's application for an award of interim counsel fees to be payable by Defendant is granted to the extent that Plaintiff is awarded $35,000 in counsel fees for having to make the instant application payable by Defendant's attorneys as set forth below (hereinafter "Plaintiff's Fee Award"), with leave to apply for additional fees, if necessary; and it is further
ORDERED, that Plaintiff's Fee Award shall be paid from marital assets and shall be allocated against Defendant's share of equitable distribution.
WHEREAS, Notice of Entry of the Decision and Order was served upon Defendant's then counsel, Costantino Fragale, Esq. via NYSCEF on February 17, 2023 (NYSCEF DOC #160);
WHEREAS, Defendant, D.R., has failed to pay to Plaintiff, M.R., any monies as required by the February 15, 2023 Decision and Order;
NOW, THEREFORE, it is hereby:
ORDERED AND ADJUDGED, that a Money Judgment be entered in favor of Plaintiff, M.R., residing at [redacted] against Defendant, D.R., residing at 1 Lexington Avenue, [redacted], in the sum on THIRTY-FIVE THOUSAND DOLLARS ($35,000), together with interest at the statutory rate of 9% per annum from the date of Judgment, and that the County Clerk docket said Judgment.
The Court signed the Money Judgment on June 13, 2023, and it was entered with the County Clerk on June 15, 2023.
On May 30, 2023, the Court issued a Pre-Trial Conference Order, directing the parties as follows: 

1. This matter is hereby certified ready for trial. No further discovery shall be permitted except upon a showing of compelling and unanticipated circumstances. Any application for post-note discovery must be pursued in accordance with the Matrimonial Part Rules.
2. Plaintiff shall serve and file a Note of Issue and Certificate of Readiness within three (3) days of this Order, if not done so already.
3. The trial of this action is hereby scheduled to commence on Monday, November 27, 2023 at 10:00 a.m. and proceed day-to-day through Tuesday, December 5, 2023 in Courtroom 1003. The Court has allocated seven (7) days for the trial. Absent unanticipated circumstances, the trial shall be concluded within these allocated days. The trial shall continue on successive days until completion. As the trial date is more than two months hence, no adjournment requests will be considered (see 22 NYCRR §125.1[g]). Expert reports must be furnished in accordance with NYCRR § 202.16(g). Failure to exchange and file the reports not later than sixty (60) days prior to the trial date and replies not later than thirty (30) days before the trial date, may, in the Court's discretion, preclude use of the expert.
4. Counsel and parties are directed to comply with all portions of the Westchester Supreme Court Matrimonial Operational Rules and Individual Part Rules of Justice James L. Hyer in preparation for the Pre-Trial Conference and Trial scheduled herein.
5. A Pre-Trial Conference shall be held on Thursday, September 7, 2023 at 2:00 p.m., in person at the Westchester County Supreme Court with all parties and counsel present.
6. Motions in limine must be in writing and made returnable on the day of the Pre-Trial Conference. Such motions must be made no less than ten (10) days' notice to opposing counsel and/or self-represented parties. Opposition submissions must be made no less than five (5) days' notice to opposing counsel and/or self-represented parties. No reply submissions may be made. To the extent possible, the Court will decide such motions prior to commencement of the Trial. To the extent that any Motions in Limine are not made timely as set forth herein, such applications will be waived.
7. At the Pre-Trial Conference, the Court shall be provided with a hard-copy Trial Notebook with the following included with tabs for each section (except for exhibits which shall be in a separate binder with tabs), a copy of which shall be filed on NYSCEF:
a. Marked pleadings.

 b. A copy of all prior Decisions or Orders on motions issued in the case.
c. A fully executed Stipulation of relevant facts that are not in dispute. The Court expects that no matter how contentious the case, there will be at least some facts that are not in dispute (e.g. the date of the marriage, the children's names and birth dates, the location of any residential real estate and the approximate date of acquisition, approximate cost, the approximate balance on any mortgage and the dates of creation of financial accounts and deferred compensation).
d. Any forensic reports, appraisals, evaluations conducted in the matter.
e. 3101(d) Expert Witness Disclosures made in this matter with proofs of service.
f. An exhibit list and pre-marked exhibits. Only those items that are received in evidence will be marked by the reporter. Copies of all exhibits intended to be offered must be presented to the Court in a ringed notebook with a table of contents, with Plaintiff's exhibits numbered, and Defendant's exhibits lettered in the order in which they are generally intended to be used, with external tabs separating each exhibit. Counsel shall exchange their notebooks with proposed exhibits at least seven (7) business days prior to the Pre-Trial Conference. Failure to timely submit an exhibit list and proposed exhibits may result in preclusion. At the Pre-trial Conference, counsel must either stipulate to the admission of the exhibits to be offered by the adverse party or state the ground or any objection to admission of any such exhibit. Such Stipulation must be prepared before the Pre-Trial Conference, in writing, so that it may be presented to the Court at the Pre-Trial Conference. Counsel must be prepared to argue to the Court at the Pre-Trial Conference, the admissibility of any exhibits to which an objection is taken. Counsel are advised that the failure to include an exhibit in the exhibit list and/or to participate in the exhibit exchange provided for herein, may result in preclusion of that exhibit.
g. A List of Witnesses, including the address of each witness, the time anticipated for the witness' direct examination, and the general subject matter of his or her testimony. The failure to identify a witness may result in the preclusion of that witness' testimony.
h. A Joint Statement of Proposed Disposition. To the extent the parties disagree on any item, Plaintiff's position should be set out first, followed by Defendant's position.
i. A Child Support Worksheet, if applicable.
j. A Spousal Support Worksheet, if applicable.
k. Updated Statements of Net Worth (with the latest available supporting documents, such as income tax returns, W-2s, brokerage and retirement plan statements).
l. Memoranda of Law concerning any procedural, evidentiary, or other legal issue which the parties anticipate the Court will need to determine.

 NOTICE: FAILURE TO COMPLY WITH THE NEW YORK STATE CIVIL PROCEDURE, LAW AND RULES, UNIFORM RULES OF THE SUPREME COURT, THE INDIVIDUAL PART RULES OF JUSTICE JAMES L. HYER AND THIS PRE-TRIAL ORDER MAY RESULT IN PRECLUSION OF WITNESSES AND/OR EVIDENCE AT TRIAL, AND THE IMPOSITION OF SANCTIONS.
On May 25, 2023, the Court held a Status Conference with Plaintiff, Plaintiff's counsel, Receiver, and pro se Defendant appearing (NYSCEF Doc. No. 203). While Defendant appeared without counsel, he notified the Court that he had contacted an attorney who would take on his case being Marc Kasowitz. Plaintiff's counsel advised the Court that she received an e-mail from Defendant, dated May 24[, 2023] at 9:20 p.m., that read, "'To all parties involved, I have retained counsel,' in caps, 'Within 30 days he will be prepared for trial,' in caps." No Notice of Appearance by any counsel for Defendant had been filed as of that appearance. Consequently, [*8]the Court advised Defendant:
During that [last] court appearance I indicated to you if you would appear without counsel, you would be proceeding as a self-represented litigant, and you would be expected to follow the directives of the court and the responsibilities as an attorney would.
I do not have on NYSCEF which is opened before me any notices of appearance for any lawyers for you. So at this point in time you are proceeding as a self-represented litigant.
On July 18, 2023, the Receiver, Evan Wiederkehr, filed a letter with NYSCEF, explaining to the Court that:

 Communication was had with D.R. concerning compliance with the recent Court Order directing appraisals of both the marital residence and the investment property located a few houses up the same street. D.R. was provided with copies of the Court Orders directing appraisals. He controls both properties.
Our correspondence is attached for the Court's reference. It is respectfully submitted that the communications speak for themselves. Request is respectfully made that the Court schedule this matter for a conference to address this issue. No useful purpose will be served by the undersigned further engaging D.R. and seeking compliance with the Court Order.
The referenced e-mail correspondence between the Receiver and Defendant, including the Receiver's e-mail to Defendant dated July 17, 2023, 4:32 p.m., provided:

 D.R.,
Attached, please see recent Court Orders directing appraisals of the two residences. I do not know if you have seen them as I do not believe you are on the efile system. Each side is required to pay half of the cost. Physical inspection is required. Please confirm this will be addressed so the Court Order is complied with promptly. It requires coordination with the appraiser's office at [redacted]. Since you control access, your participation is necessary to obtain proper appraised values from a licensed appraiser. Please confirm receipt, that payment has been made and that access is being provided without delay. Thank you.

 Evan
Also included is the e-mail response from Defendant to the Receiver:

 Why would I respond to your missives If you ignore EVERYTHING I SAY ?

 ...AND, continue to ignore FACTS AND THE OFFICIAL COURT TRANSCRIPTS most 
 notably JUDGE KOBA QUINN's COURT ORDER TO The PLAINTIFF & her GONIFF 
 ATTORNEY, KEN NOVENSTERN her ATTORNEY at the time. This, I believe occurred 
 11 months ago.

 Sorry, EVAN that this wasn't the slam dunk you expected. Let me perfectly 
 clear: NO ONE, and certainly not ANOTHER APPRAISER is entering my HOME OR 
 the PROPERTY OWNED BY [redacted], LLP.

 Clear?

 DHR
On July 19, 2023, the Court entered an Order, directing a Status Conference to be held on July 21, 2023, at 9:00 a.m., requiring appearances by all counsel, parties, and the Receiver.
On July 21, 2023, the Court held a Status Conference wherein Plaintiff's counsel, Plaintiff, and the Receiver appeared (NYSCEF Doc. Nos. 211, 243). The Court noted Defendant's failure to appear, and the lack of any request for an adjournment made by Defendant. Plaintiff's counsel advised the Court (NYSCEF Doc. No. 243 at 2-3):

 So, Judge we did receive e-mails from D.R. along with being copied to Mr. Wiederkehr maybe it was the opposite way, actually, but so D.R. was aware that he was to be here because he stated he was aware in the e-mails. But that he has been on vacation or will be leaving on vacation. The dates have changed in the e-mails from I think it was the 18th to the 20th.
And so while he has also stated that he doesn't have any funds, he has told, and he did tell us the last time that he was going to be on vacation, out of the country, et cetera.
So somehow, he is still finding the funds to do that, which is concerning because there are restraining orders.
Then, following the July 21, 2023 Status Conference, the Court entered an Order, directing:
(1) Receiver's application to file two Orders to Show Cause pertaining to enlargement of scope of appointment and duties is granted;
(2) Plaintiff's application to file an Order to Show Cause pertaining to the preparation of the investment property for sale, and for Defendant to be removed from said property and for ancillary relief is granted;
(3) the briefing schedule for both motions shall be as follows:
[a] Motion shall be filed by July 28, 2023;
[b] Opposition shall be filed by August 4, 2023;
[c] Reply shall be filed by August 11, 2023;
[d] Return date, no appearances, no oral argument, decision on submission by August 11, 2023;
[e] All service upon the self-represented Defendant shall be by overnight delivery and e-mail to [redacted], and Affidavits of Service with a copy of the tracking slips shall be filed with the Court before the return date. Movants to submit with motion papers proposed Orders to be entered by the Court;
(3) Plaintiff's counsel shall order transcript, pay cost for same, and submit it to the Court to [*9]be "so ordered".
On July 28, 2023, Plaintiff's counsel filed an Order to Show Cause (hereinafter Motion Sequence "7"), requesting an Order:
(1) Excluding Defendant from the marital investment real property to wit: 7 Lexington Drive, [redacted], to assess the state of said property, appraise said property and ready said property for sale;
(2) Finding Defendant in violation of the Court Order appointing a neutral real property appraiser;
(3) Directing Defendant to pay to Plaintiff the amount of $675 as and for reimbursement of his share of the neutral real property appraisal fees;
(4) An Order directing Defendant to sign an Authorization to Release Treasury Records;
(5) Finding Defendant in violation of this Court's Order directing Defendant to sign the Authorization to Release Treasury Records by May 31, 2023;
(6) An Order awarding Miller Zeiderman, LLP counsel fees in the sum of $35,000 on behalf of Plaintiff for fees/costs associated with the instant motion and associated court appearances;
(7) Granting Plaintiff such other and further relief as the Court may deem just, proper and equitable.
On July 31, 2023, the Court conformed Motion Sequence #7 and directed: (1) Motion Sequence #7 be served immediately on Defendant; (2) Answering papers be served and filed by August 4, 2023; (3) Reply papers be served and filed by August 11, 2023; and (4) the return date be scheduled for August 11, 2023, with no appearances required.
On July 31, 2023, the Receiver filed an Order to Show Cause (hereinafter Motion Sequence "8"), requesting that an Order be entered:
(1) Directing and Requiring Fidelity Investments to comply with the Court's Order, dated March 10, 2023, so as to provide the Court-Appointed Receiver with direct access to account statements and online access to account number [redacted] (or any successor account); and 
(2) for such other and further relief as this Court deems just, proper and equitable.
That same day, the Court conformed Motion Sequence #8 and directed: (1) Motion [*10]Sequence #8 be served on Defendant, Plaintiff's counsel, and Fidelity Investments by August 3, 2023; (2) Answering papers be served and filed by August 11, 2023; (3) Reply papers be served and filed by August 15, 2023; and (4) a return date be scheduled for August 16, 2023. 
On July 31, 2023, the Receiver filed an Order to Show Cause (hereinafter Motion Sequence "9"), requesting that an Order be entered:
(1) Directing the Receiver to coordinate access to the subject residential properties in this matter located at 1 Lexington and 7 Lexington for the Court appointed real property appraiser to perform updated appraisals in this matter;
(2) Directing a Sheriff, Marshal, or other peace officer to be present for such appraisals in accordance with the proposed Order provided herewith; and
(3)  for such other and further relief as this Court deems just, proper and equitable.
That day, the Court conformed Motion Sequence #9 and directed: (1) Motion Sequence #9 be served on Defendant and Plaintiff's counsel by August 3, 2023; (2) Answering papers be served and filed by August 11, 2023; (3) Reply papers be served and filed by August 15, 2023; and (4) a return date be scheduled for August 16, 2023.
On August 1, 2023, the Receiver filed proofs of service pertaining to Motion Sequences #8 and #9. On August 7, 2023, Plaintiff's counsel filed proofs of service pertaining to Motion Sequence #7.
On August 11, 2023, the Receiver filed a letter withdrawing Motion Sequence #8, indicating, "Upon receipt of the conformed Order to Show Cause, dated July 31, 2023, Fidelity provided the requested documents rendering the application resolved."
On August 17, 2023, Defendant had failed to file anything in opposition, and the Court entered a Decision and Order on Motion Sequence #7, ordering:
(1) Plaintiff's Order to Show Cause (MS #7) is granted to the extent set forth herein;
(2) that effective immediately, Defendant, D.R. shall vacate the marital investment real property to wit: 7 Lexington Drive, [redacted] (hereinafter "7 Lexington Property") and shall stay away 7 Lexington Property until further Order of the Court;
(3) that 7 Lexington Property shall be inspected and appraised pursuant to the June 7, 2023, Order Appointing Neutral Real Property Appraiser and the Receiver shall facilitate and coordinate said inspection and appraisal;
(4) that the Receiver shall ready 7 Lexington Property for sale;
(5) that Defendant is in violation of the Court Order Appointing a Neutral Real Property [*11]Appraiser;
(6) that Defendant shall pay to Plaintiff the amount of $675 as and for reimbursement of his 50% share of the neutral real property appraisal fees and said payment shall be made within ten (10) days of the date of this Order;
(7) that Defendant, his agents, employees and/or any attorneys are hereby restrained from incurring unreasonable debts hereafter, including, but not limited to further borrowing against any credit line secured by the family residence or any marital property, further encumbering any marital assets or using jointly titled credit cards or cash advances against jointly titled credit cards until further order of the Court;
(8) that Defendant shall immediately sign an Authorization to Release Treasury Records (which is attached to Plaintiff s July 28, 2023 Order to Show Cause as Exhibit 9) and shall return the wet ink original authorization to Plaintiff's counsel to be received at 140 Grand Street, 5th Floor, White Plains, New York 10601 within five (5) days of the date of this Order;
(9) Defendant is in violation of the June 5, 2023 Court Order directing Defendant to sign the Authorization to Release Treasury Records;
(10) that Defendant shall pay to Miller Zeiderman LLP interim counsel fees in the sum of $35,000 as and for Plaintiff s legal fees, and said payment shall be made such that it is received by Miller Zeiderman LLP in usable funds within ten (10) days of the date of this Order;
(11) that Plaintiff's counsel shall send a copy of this Order to the pro se Defendant by e-mail to [redacted] and by overnight mail.
On August 17, 2023, Defendant failed to file any opposition to the motion, and the Court entered a Decision and Order Motion Sequence #9 granting the requested relief.
On September 5, 2023, Plaintiff filed an Order to Show Cause (hereinafter "Motion Sequence #10"), requesting that an Order be entered granting the following relief:
(a) Pursuant to CPLR § 3162 and CPLR § 3120, precluding Defendant from introducing testimony and/or evidence that was not timely and/or properly disclosed;
(b) Pursuant to CPLR § 3101(d), precluding Defendant from introducing expert testimony and/or evidence that was not timely and/or properly disclosed;
(c) Pursuant to CPLR § 3126, an order that issues to which the information is relevant shall be deemed resolved for purposes of this action in accordance with the claims of the party obtaining the order;
(d) An order prohibiting the disobedient party from supporting and opposing designated claims or defenses, from producing in evidence designated things or items of testimony, or from introducing any evidence of the physical, mental or blood condition sought to be determined or from using certain witnesses;
(e) An order striking Defendant's pleadings or parts thereof, or in the alternative, dismissing the action or any parts thereof, or rendering a judgement by default against the Defendant;
(f) Pursuant to Rule § 130-1.1, imposing financial sanctions upon Defendant in the form of actual expenses and reasonable attorneys' fees payable to Plaintiff in an amount to be determined, incurred as a result of Defendant's frivolous conduct; and
(g) Granting such other and further relief as this Court deems just, proper and equitable.
On September 5, 2023, the Court entered an Order pertaining to Motion Sequence #10, which provided:
On or about September 5, 2023, Plaintiff filed a proposed Order to Show Cause, seeking certain in limine relief.
Because Plaintiff filed this motion less than 10 days prior to the pre-trial conference in direct contravention to the Court's order (NYSCEF Doc. No. 249 at 6), the Pre-Trial Conference Order (NYSCEF Doc. No. 200 at 2), and this Court's Part Rules (see Section F[b]), the Court declines to sign the Order to Show Cause.
The Court directs the parties and counsel to appear before the undersigned, in person, on Thursday, September 7, 2023 at 2:00 p.m. for the pre-trial conference in Courtroom 1003.
On September 6, 2023, Plaintiff's counsel submitted a letter requesting the Court waive the filing of a Stipulation of Facts not in dispute and Joint Statement of Proposed Disposition, asserting that communication with Defendant was made and Defendant failed to response. Plaintiff's counsel annexed a copy of an e-mail sent to Defendant on September 5, 2023. On September 6, 2023, the Court granted the request. 
On September 6, 2023, Plaintiff's counsel filed an Exhibit List and copies of all proposed exhibits. On September 7, 2023, Plaintiff's counsel filed a Witness List, Plaintiff's Statement of Proposed Disposition, with proof of service of all trial documents on Defendant.
A Pre-Trial Conference was held on September 7, 2023. Plaintiff and Plaintiff's counsel appeared. Defendant did not appear after the Court had waited over two-and-one-half hours [*12]following the scheduled start time of the conference to call the matter to afford Defendant additional time to appear. At that time, Defendant had not filed any trial documents pursuant to the Court's directives. A so-ordered transcript from this appearance was filed, which provided, in part (NYSCEF Doc. No. 331 at 2-3, 4-7):
THE COURT: Good afternoon everybody. Please be seated. There was a pretrial conference order that was uploaded by the Court on May 31st of this year, that's NYSCEF document number 200. And that provided in part that a pretrial conference would be held today at 2:00 p.m. Thank you for everybody's patience. It is now 4:40. And that a trial would be held on this matter to commence on November 27th, and proceed day to day to December 5th.
Counsel for plaintiff, have you had the opportunity to speak with the opposing party who is pro se at this point?
MS. TRAZZERA: We have, your Honor. We actually tried to settle with him. That was sort of an exercise in futility. He has not exchanged the proposed trial exhibits. We did exchange them with him. They were sent to his house and we also exchanged them via e-mail. We did remind him of the exchange. He did not really reply.
So at this point, we would just ask for a default, and potentially come back to do an inquest in short order.
* * *
THE COURT: The pretrial conference order indicates in part on page one paragraph two: Plaintiff shall serve and file a note of issue and certificate of readiness within three days of this order if not done so already.
And that's fine. I want to ensure that the defendant was given adequate notice to be here. So that's what I'm looking at. Did you serve a copy of the pretrial conference order on D.R.?
MS. TRAZZERA: I don't believe, but I would have to double check.
THE COURT: While you do that, I want to confirm how the court system served it. 

Okay. Upon further inquiry, the court clerk has advised me that the defendant was present in court and she provided him with notice that he was supposed to be here last week.
Accordingly, pursuant to the part rules of the Honorable James L. Hyer, Section E, A, counsel including per diem covering counsel and self-represented litigants must appear on time, be fully familiar with the action on which they appear, be authorized and prepared to discuss all factual and legal issues presented by the litigation, and settlement demands or offers, and be authorized to enter into any agreement on behalf of their client. Failure to comply may be treated as a default for purposes of 22 NYCRR Section 202.27, and/or may be treated as a failure to appear for purposes of 22 NYCRR Section 130.2.1.
In matrimonial actions, attorneys must appear with their clients for all conferences unless such appearances are dispensed with by the Court on prior written request on notice to the adversary and, if applicable, the children's attorneys.
If counsel or a party are unable to appear on time due to unforeseen circumstances, i.e., delays due to inclement weather or road closures, counsel should contact the opposing counsels and advise the part clerk or court staff by telephone as soon as possible. Tardy arrivals will not be tolerated.
Pursuant to the Part Rules of the Honorable James L. Hyer, Section E(b), a request to [*13]adjourn a conference must be made in writing, by NYSCEF only, except as provided in Section C(a), at least two full business days in advance of the scheduled conference, unless there is an emergency.
Pursuant to Uniform Rules of the New York State Trial Courts, Section 202.27, at any scheduled call of the calendar, or at any conference, if all parties do not appear and proceed, or announce their readiness to proceed immediately, or subject to the engagement of counsel, the Judge may note the default on the record and enter an order as follows: A, if the plaintiff appears but the defendant does not, the Judge may grant a judgment by default or order an inquest. B, if the defendant appears but the plaintiff does not, the Judge may dismiss the action and may order a severance of counterclaims or cross-claims. C, if no party appears, the Judge may make such order as appears just.
To date, today the defendant has failed to appear. In addition, the defendant has failed to make any application to this Court for an adjournment. Further, as noted on the record earlier today, the defendant appeared in this courthouse and spoke to my part clerk, and she presented him with notice that he was to appear here today.
Accordingly, I'm holding the defendant in default. And I'm scheduling this matter for inquest.
Then, on September 8, 2023, the Court entered an Order, providing the following (NYSCEF Doc. No. 327):
A Pre-Trial Conference was held before the Hon. James L. Hyer, J.S.C., on September 7, 2023, wherein Plaintiff and Plaintiff s counsel appeared. Defendant failed to appear. The Court placed a decision on the record holding Defendant in default and directing that an Inquest be held on November 3, 2023, at 9:00 a.m.
It is hereby ORDERED that:
1. Plaintiff shall serve Notice of Inquest on Defendant by three (3) methods: 
(a) e-mail to [redacted];
(b) overnight traceable delivery to 1 Lexington Avenue, [redacted];
(c) via text message to [redacted] and [redacted].
2. Plaintiff shall file an Affidavit of Service with a copy of the tracking slip, e-mail, and text messages.
3. By October 31, 2023, the parties shall file, to the extent that they have not done so already, proposed exhibits to be marked for identification at the Inquest and witness list for witnesses to be called at the Inquest.
4. Plaintiff shall order the September 7, 2023, transcript, pay the cost and submit to the Court to be "So Ordered" by September 15, 2023.
5. Parties and counsel shall appear in person on November 3, 2023, at 9:00 a.m. for the Inquest.
On September 12, 2023, Plaintiff's counsel filed proof of service of the Order scheduling the Inquest.
On October 31, 2023, Plaintiff's counsel filed additional exhibits and a Witness List. On November 2, 2023, Plaintiff's counsel filed proof of service of these additional trial documents, along with additional exhibits for which Plaintiff's counsel filed proof of service on November 3, 2023. Despite the additional time provided by the Court at the September 7, 2023 Pre-Trial Conference for all parties to submit additional trial documents by October 31, 2023, Defendant did not file any trial documents.
On November 6, 2023, the Court entered a Temporary Order of Protection for Plaintiff's benefit, directing Defendant to: (1) stay away from Plaintiff, the home of Plaintiff and business of Plaintiff; (2) refrain from communication with Plaintiff; (3) refrain from remotely controlling, monitoring or otherwise interfering with any electronic device or other object effecting the home or vehicle or property of Plaintiff; and (4) refrain from any conduct that would constitute a family offense against Defendant. The Order was to remain in effect until December 20, 2024.
The Court held an Inquest on November 3, 2023, and November 6, 2023. While the Court will set forth below a summary of the evidence admitted and testimony received at Inquest, the Court notes that Defendant's conduct at the Inquest goes to the issue of Defendant's credibility, veracity, and clearly reflects the continued pattern of Defendant's behavior exhibited throughout this action. Defendant's conduct included an altercation with a court officer, a misrepresentation with respect to a request for adjournment, and tardiness on the second day of the Inquest.
With respect to the altercation with the court officer, as reflected in the Inquest transcript, following Plaintiff's testimony where she asked the Court to grant her the authority to prepare the parties' two real properties for sale (NYSCEF Doc. No. 359 at 67-68):
D.R.: Just so we're clear, over my dead body.
COURT OFFICER: Sir. Sir.
D.R.: Don't touch me.
COURT OFFICER: Sir, you can't—
D.R.: Don't touch me.
COURT OFFICER: I'm not touching you, sir.
D.R.: Move back.
COURT OFFICER: Just keep it to yourself sir.
THE COURT: Okay, sir-
D.R.: Move back. I'm sorry.
THE COURT: So, I'm going to make a record here. I'm going to ask that there is no outbursts.
D.R.: I apologized. I apologize.
THE COURT: It's fine. Let me just make my record. You have the ability to object and you have the ability to participate by cross examining this witness or any others that are called by Plaintiff. You will not disrupt this proceeding. If you do that again or if you assault a member of the staff because the Officer approached you, okay, and you were very menacing just now. I will not tolerate that. Do we understand?
D.R.: We do understand.
With respect to Defendant's misrepresentation with respect to a request for adjournment of the second day of Inquest, Defendant first objected, asserting he was engaged in humanitarian assistance, but then he conceded his requests were because he wanted more time to retain legal counsel (NYSCEF Doc. No. 359 at 100):
D.R.: Is the attorney for D.R. allowed to speak?
THE COURT: You're allowed to speak sir.
D.R.: Can I?
THE COURT: As a self-represented litigant, we're recalling this on Monday—
D.R.: I am not available.
THE COURT: Well, you have to make yourself available, sir.
D.R.: I'm flying to Israel.
THE COURT: I'm sorry?
D.R.: I'm leaving the country and I'm trying to get a family out of Ukraine.
THE COURT: Sir, do you have a plane ticket?
D.R.: I do not need a plane ticket. I'm going to the airport and—I will be here, yeah.
THE COURT: You're going to be here—
D.R.: I don't have an opportunity to find an attorney.
THE COURT: Sir, I'm sorry—
D.R.: I'll be here.
The Court entered an Order on November 8, 2023, directing: (1) Plaintiff's counsel shall order and submit the transcript to be "So Ordered" to the Court by November 30, 2023; (2) Post-Inquest submissions shall be no greater than 15 pages and shall be submitted by NYSCEF filing by November 30, 2023, with a copy to pro se Defendant by e-mail; and (3) the court-appointed Receiver to submit Affirmation of Services with request for payment by November 30, 2023.
The Court granted Plaintiff's counsel's request for an extension for the parties to submit Post Inquest submissions to December 8, 2023.
On December 7, 2023, Plaintiff's counsel filed the Inquest Transcripts.
On December 8, 2023, the Receiver submitted an Affirmation of Attorneys' Fees, which included invoices reflecting fees incurred in this matter totaling $12,654.80 for the period of March 9, 2023, through August 2, 2023. The Receiver's Affirmation noted, "Notwithstanding the foregoing legal invoices, the Receiver does not seek compensation at this time, without prejudice to the Receiver's right to seek compensation in accordance with the applicable statute at the time of receipt of the net proceeds of sale from any real property sold by the Receiver in this matter."
On December 8, 2023, Plaintiff's counsel filed a Post Trial Memorandum, with proof of service upon Defendant, requesting the entry of a judgment of divorce granting the following relief:
1. Directing that Plaintiff be awarded exclusive use and occupancy of the Marital Residence located at 1 Lexington Drive, [redacted] (hereinafter the "Marital Residence") for purposes of selling the Marital Residence and Defendant be ordered to vacate and stay away from the Marital Residence pursuant to an Order of Protection (11/3/23 Transcript, P. 67, L. 1 — P. 69, L. 19, 11/3/23 Transcript, P. 145, L. 6 — P. 146, L.1, and 11/6/23 Transcript, P. 67, L. 10-19).
2. Directing that Defendant have an opportunity to remove whatever furnishings and artwork he wishes from the Marital Residence prior to the date by which Defendant is directed to vacate, and that following that vacatur date, Plaintiff is permitted to keep and/or dispose of any furnishings or artwork that remain in the Marital Residence as of that date (11/3/23 Transcript, P. 104, L. 6-16, and P. 105, L. 1-6).
3. Directing that the family photos currently located in the Marital Residence be left in the Marital Residence to permit Plaintiff an opportunity to choose/retain some of the family photos as her sole and separate property and return the balance of any family photos to Defendant to retain said balance of the family photos as his sole and separate property (11/3/23 Transcript, P. 7-13).
4. Entering an Order authorizing the Court Appointed Receiver to execute all documents necessary to sell, transfer, and convey title to the Marital Residence on behalf of the Defendant (11/3/23 Transcript, P. 103, L. 5-11), as set forth below.
5. Directing that Plaintiff, in conjunction with the Court Appointed Receiver, be authorized to list and sell the Marital Residence (11/3/23 Transcript, P. 67, L. 1 — P. 69, L. 19).
6. Directing that the Cenlar/Citibank Home Equity Line of Credit, which is attached to the Marital Residence and in the parties' joint names, be paid in full from the proceeds of the sale of the Marital Residence prior to any distribution of net proceeds of the sale of the Marital Residence to Plaintiff (11/3/23 Transcript, P. 73, L. 7—11).
7. Directing that Plaintiff be entitled to retain 100% of any net proceeds of the sale of the Marital Residence (11/3/23 Transcript, P. 69, L. 8-19).
8. Directing that Plaintiff be awarded exclusive use and occupancy of the investment property located at 7 Lexington Drive, [redacted] (hereinafter the "Investment Property") and Defendant be ordered to vacate and stay away from the Investment Property pursuant to an Order of Protection (11/3/23 Transcript, P. 67, L. 1 — P. 69, L. 19, 11/3/23 Transcript, P. 145, L. 6 — P. 146, L. 1, and 11/6/23 Transcript, P. 67, L. 10-19).
9. Entering an Order authorizing the Court Appointed Receiver to execute all documents necessary to sell, transfer, and convey title to the Investment Property on behalf of the Defendant (11/3/23 Transcript, P. 103, L. 5-11), as set forth below.
10. Directing that Plaintiff, in conjunction with the Court Appointed Receiver, be authorized to list and sell the Investment Property (11/3/23 Transcript, P. 67, L. 1 — P. 69, L. 19).
11. Directing that Plaintiff be entitled to retain 100% of any net proceeds from the sale of the Investment Property (11/3/23 Transcript, P. 69, L. 8-19).
12. Directing that Plaintiff be awarded 100% of the funds on deposit in all checking and savings accounts titled in her name individually (11/3/23 Transcript, P. 70, L. 24 — P. 71, L. 2).
13. Directing that Defendant be awarded 100% of the funds on deposit in all checking and savings accounts titled in his name individually (11/3/23 Transcript, P. 70, L. 24 — P. 71, L. 2).
14. Directing that, to the extent there are any joint checking and/or savings accounts that remain open, that Plaintiff be permitted to close said joint checking and/or savings accounts, remit 50% of any balance to Defendant, and retain the remaining 50% of any balance (11/3/23 Transcript, P. 71, L. 3-10).
15. Directing that Plaintiff be awarded 100% of all retirement accounts titled in her name individually (11/3/23 Transcript, P. 71, L. 11 — 20).
16. Directing that Defendant be awarded 100% of all retirement accounts titled in his name individually (11/3/23 Transcript, P. 71, L. 11 — 20).
17. Directing that Plaintiff be awarded a money judgment against Defendant for the Fidelity Investment Account x5287 shortfall in the sum of TWO HUNDRED AND FOURTEEN THOUSAND, SEVEN HUNDRED AND TWELVE DOLLARS ($214,712) with statutory interest from May 23, 2022 (11/3/23 Transcript, P. 71, L. 21 — P. 72, L. 7).
18. Directing that Defendant be awarded 100% of any other Fidelity accounts titled in Defendant's name individually (11/3/23 Transcript, P. 72, L. 8-11).
19. Directing that any credit card(s) or lines of credit debt in Defendant's name individually be Defendant's sole responsibility (11/3/23 Transcript, P. 71, L. 19—21, and P. 73, L. 2-6).
20. Directing that any credit card(s) or lines of credit debt in Plaintiff's name individually be Plaintiff's sole responsibility (11/3/23 Transcript, P. 71, L. 12-18, and P. 72, L. 22 — P. 73, L. 1).
21. Directing that there be no award of spousal support, whether temporary or post-divorce, awarded in favor of either party (11/3/23 Transcript, P. 73, L. 12-22).
22. Directing that Plaintiff have the authority to dissolve [redacted] Inc. and any associated bank accounts (11/3/23 Transcript, P. 81, L. 11-17).
23. Directing that the Court's second award of $35,000 in legal fees payable by Defendant to Plaintiff on or before August 26, 2023 (NYSCEF Doc # 230) be reduced to a money judgment with statutory interest from August 26, 2023 payable by Defendant to Plaintiff in the sum of THIRTY-FIVE THOUSAND DOLLARS ($35,000) (11/3/23 Transcript, P. 90, L. 2-12).
24. Directing that Plaintiff be awarded an additional money judgment in the sum of TWO HUNDRED AND TWELVE THOUSAND, FIVE HUNDRED AND NINETY DOLLARS AND FIFTY-SIX CENTS ($212,590.56) representing an additional counsel fee award together with statutory interest from the date of the Money Judgment against Defendant and in favor of Plaintiff (11/3/23 Transcript, P. 92, L. 8 — P. 93, L. 21).
25. Directing Defendant to be 100% responsible for paying the fees associated with the Court Appointed Receiver (Evan Wiederkehr, Esq.) once such fees are approved by the Court (11/3/23 Transcript, P. 102, L. 21-25).
26. Directing that each party be responsible to maintain and pay for his/her own health insurance coverage and all costs associated therewith without contribution from the other party (11/3/23 [*14]Transcript, P. 103, L. 23 — P. 104, L. 5).
27. Directing that each party retain any jewelry and personal property in his/her possession (11/3/23 Transcript, P. 104, L. 17-25).
28. Directing that Plaintiff be solely responsible for all expenses associated with her Lexus NX300 vehicle, and that Defendant be solely responsible for all expenses associated with his Cadillac SUV and Chevy Volt vehicles (11/3/23 Transcript, P. 105, L. 18 - P. 106, L. 7).

 29. Issuing a permanent Order of Protection with the same terms and 
 conditions of the Temporary Order of Protection dated November 6, 2023, as 
 well as the additional provisions that Defendant vacate and stay away from 
 the Marital Residence and the Investment Property for a period of one (1) 
 year following the Judgment of Divorce (11/3/23 Transcript, P. 145, L. 6 — 
 P. 146, L. 1, and 11/6/23 Transcript, P. 67, L. 10-19).

 30. Granting Plaintiff a divorce.
Defendant did not file any Post Trial submission. On February 23, 2024, the Receiver filed an Order to Show Cause (hereinafter "Motion Sequence #11"), requesting an Order granting the following relief:
(1) Directing the immediate sale of the real property located at 1 Lexington Drive, [redacted] (hereinafter "the Marital Residence") by reason of the pending foreclosure action and resulting risk of loss of this marital asset;
(2) Granting the Receiver the authority to have Defendant immediately removed from the Marital Residence to permit the Receiver to ready, list, market and sell the Marital Residence using a qualified and licensed real estate broker to secure fair market value for same;
(3) Directing the Receiver the retain the net proceeds of sale of the Marital Residence pending written agreement of the parties or Order of the Court; and
(4) Together with such other and further relief as to this Court is deemed to be just and proper.
The Court conformed Motion Sequence #11 and directed: (1) a return date of March 22, 2024, at 9:30 a.m.; (2) service of Motion Sequence #11 on Plaintiff's counsel by NYSCEF by March 1, 2024; (3) service of Motion Sequence #11 on Defendant by Federal Express OvernightDelivery by March 1, 2024; (4) answering papers to be served and filed by March 15, [*15]2024; and (5) reply papers to be served and filed by March 22, 2024.
As of the date of this Decision and Order, Defendant has not provided any answering submissions, but a Notice of Withdrawal of Consent was filed by Peter Schuyler, Esq., which noted:
TO THE CLERK OF THE COURT:
PLEASE TAKE NOTICE, that the undersigned has withdrawn his consent pursuant to CPLR § 3421(d). I requested and received the Defendant's permission to file a consent to this case for the limited purpose of reviewing filed documents with him in my presence as part of a consultation, which did not result in any agreement with the undersigned to represent the Defendant in this matter. I certify that this Notice of Withdrawal of Consent was mailed today to D.R. at his address at 1 Lexington Drive, [redacted].
Trial Testimony and Documents in Evidence
On November 3, 2023, and November 6, 2023, the Court held an Inquest in this action. The following witnesses testified: (1) Plaintiff M.R.; (2) Defendant D.R.; and (3) Receiver Evan Wiederkehr, Esq.
The Court precluded Defendant from offering any evidence at trial due to his failure to comply with: (1) the Court's Part Rules; (2) the May 31, 2023 Pre-Trial Conference Order (NYSCEF Doc. No. 200); and (3) the September 8, 2023 Inquest Order (NYSCEF Doc. No 327). While the Court received proof of service of these Orders on Defendant, the Court did not receive any requests from Defendant for adjournments of the deadlines set forth in the Pre-Trial and Inquest Orders.
During the Inquest, Plaintiff admitted 21 exhibits, largely on consent of Defendant, including:
 - Exhibit 13(D)(1) — Fidelity Statements
 - Exhibit 2 — May 23, 2022 Stipulation
- Exhibit 10(D)(3) — Fidelity Statements
 - Exhibit 13(B)(1) — JP Morgan Chase Statements
- Exhibit 13(C) — TD Bank Statements
- Exhibit 5(B) — Plaintiff's Statement of Net Worth dated 8/25/2023
- Exhibit 12(A) — Plaintiff's Legal Invoices
- Exhibit 12(A) — Summary of Monthly Totals
- Exhibit 12(C) — Novenstern Retainer Agreement
- Exhibit 12(B) — MZ Retainer Statement
- Exhibit 14 — Money Judgment
- Exhibit 12(E) — Novenstern Invoices
- Exhibit 12(D) — Receiver Invoices
- Exhibit 15 — E-Mails 5/26/2023
- Exhibit 16 — E-Mail dated 6/1/2023
- Exhibit 17 — E-Mails dated 7/11/2023-7/15/2023
- Exhibit 18 — E-Mails dated 2/28/2023
- Exhibit 19 — E-Mails dated 8/25/2023 and 8/29/2023
- Exhibit 20 — E-Mail dated 8/30/2023
- Exhibit 21 — Flash Drive with Two Recordings
a. Plaintiff's Testimony
Direct Examination -
Plaintiff testified that she is married to Defendant. Plaintiff is 70 years old (DOB: xx/xx/1953), and Defendant is 69 years old (DOB: xx/xx/1954). The parties were married in Braintree, Massachusetts on December 3, 1983, in a religious ceremony. Together, they have two emancipated children of the marriage — J.R. (DOB: xx/xx/1985), and B.R. (DOB: xx/xx/1989). Plaintiff testified that the parties' marriage had broken down irretrievably on or before June 28, 2020, and that she has removed any barriers to Defendant's remarriage. Plaintiff commenced this action on December 28, 2020, at which time the parties had lived continuously in New York State of New York for a period of two years.
Plaintiff testified that Defendant dissipated assets. When presented with Plaintiff's Exhibit #13(D)(1), which was moved into evidence on consent, Plaintiff identified the documents as Fidelity retirement account statements. When directed to bate stamp MZ 1539 of that Exhibit, Plaintiff identified account number 5287 as an investment account funded during the parties' marriage, titled in both parties' names, and having a balance of $364,373.29 as of December 31, 2020. Plaintiff testified that during the pendency of this action, she did not remove funds from this account, buy or sell stock from this account, and that the parties had agreed as to how this account would be divided between them.
Plaintiff's Exhibit #2 was moved into evidence on consent, which was titled Stipulation to Partially Distribute Marital Assets signed by the parties in May 2022. Plaintiff stated that she recognized both parties' signatures and she understood that this agreement provided that the funds in this account would be divided between the parties with each receiving 50% of the value of the account as of May 23, 2022. Plaintiff testified that that amount was $651,688.00, leaving [*16]her with an expected wire of $325,844.00. Plaintiff stated that she received a wire pursuant to the agreement in the amount of $111,132.00 from a SEP IRA account, leaving her with a shortfall of $214,712.00, which she is now owed. Plaintiff testified that her name was immediately removed from the Fidelity account.
Plaintiff's Exhibit #10(D)(3) consisting of Fidelity statements for account 5287 was moved into evidence on consent. Plaintiff testified that the Fidelity Account 5287 had a balance of $14,863.74 as of May 31, 2023. Plaintiff then testified that Defendant spent down this account during the pendency of this action by $349,509.55 as the balance of the account as of December 31, 2020, was $364,373.29.
When presented with Plaintiff's Exhibit #13(D)(1), Plaintiff testified that the value of the Fidelity SEP IRA account ending in 2431 as of December 31, 2020, was $607,797.27. Plaintiff explained that this SEP IRA was funded during the parties' marriage and was in Defendant's name. As of July 2023, the value of this account was $17,693.16. Plaintiff testified that during the pendency of this action, she did not withdraw funds from this account, she had no access to the account, and that the account was depleted by $590,104.27.
With respect to Fidelity IRA account ending 7807, Plaintiff testified that the balance as of December 31, 2020, was $582,206.75, having been funded during the parties' marriage and being titled in Defendant's name. Plaintiff stated that during the pendency of this action, she did not withdraw funds from this account, and she had no access to the account. Plaintiff testified that the balance of this account as of April 30, 2022, was $0.01, having been depleted during the pendency of this action by $582,206.74.
Plaintiff testified that with respect to Fidelity account ending 3971, as of December 31, 2020, the balance was $148,608.37, having been funded during the parties' marriage and being titled in Defendant's name. Plaintiff explained that during the pendency of this action, she did not withdraw funds from this account, and she had no access to the account. Plaintiff testified that the balance of this account as of August 31, 2022, was ($2,772.17), having been depleted during the pendency of this action by $151,000.00.
With respect to Fidelity SEP IRA account ending in 3191, Plaintiff stated that the balance as of December 30, 2020, was $181,564.01, having been funded during the parties' marriage and being titled in Defendant's name. Plaintiff explained that during the pendency of this action, she did not withdraw funds from this account and had no access to the account. Plaintiff noted that the balance of this account as of June 20, 2023, was $5,161.35, having been depleted during the pendency of this action by $176,000.00.
As to Fidelity IRA account ending 5474, Plaintiff testified that the balance as of December 31, 2020, was $352,833.21, having been funded during the parties' marriage and being titled in Defendant's name. During the pendency of this action, Plaintiff did not withdraw funds from this account, and she had no access to the account. Plaintiff testified that the balance of this account as of July 31, 2023, was $30,471.74, having been depleted during the pendency of this action by $322,000.00.
Plaintiff's Exhibit #13(B)(1) was admitted into evidence on consent and consisted of JP Morgan Chase statements for account ending 1159, being a checking account in Defendant's name that was funded during the parties' marriage and having a balance as of December 24, 2020, of $235,030.41. During the pendency of this action, Plaintiff did not withdraw funds from this account and had no access to the account. Plaintiff testified that the balance of this account as of October 13, 2021, was $5,074.00, having been depleted during the pendency of this action [*17]by $230,000.00.
Plaintiff's Exhibit #13C was admitted into evidence on consent. Plaintiff identified this exhibit as statements for a TD Bank account ending in 0542, having a balance as of March 31, 2022, of $16,303.61. The account was titled in the name of [redacted], LLC, an entity owned by Defendant. Plaintiff testified that Defendant was the only person she was aware of that has access to that account. As of March 14, 2022, the account had a balance of $0.00, having been depleted during the pendency of this action by approximately $16,303.00. Plaintiff then testified that between March 14, 2022 and December 31, 2022, approximately $460,328.00 was deposited into this account, which had a balance of $0.00 as of February 28, 2023.
Plaintiff's counsel requested that the Court take judicial notice of all prior Orders and transcripts in this matter filed in the NYSCEF system. The Court granted the application without objection.
Plaintiff's Exhibit #5B was moved into evidence. Plaintiff testified that she signed this document before a notary public on August 25, 2023, and identified the document as her Statement of Net Worth. Plaintiff testified that the document reflected accurate financial account balances and that they may be slightly less as of the time of her testimony due mostly to her litigation expenses arising out of this action. As of August 21, 2023, Plaintiff had a Wells Fargo IRA account ending in 9991 with a balance of $24,993.00. Plaintiff testified that as of August 21, 2023, she had a Wells Fargo IRA account ending in 1041 with a balance of $1,240,000.00. As of August 21, 2023, Plaintiff had a Wells Fargo IRA ending in 6603 with a balance of $29,712.00, and a Wells Fargo IRA account ending in 2320 with a balance of $267,185.00. As of August 21, 2023, Plaintiff had a Wells Fargo IRA account ending in 2585 with a balance of $57,961.00.
Plaintiff testified that during the past two-and-one-half years, she withdrew $40,000.00 from an IRA account she inherited from her mother, but she was unable to identify which IRA was the inherited one. Plaintiff stated that she also inherited two annuities, which she cashed in one-and-one-half years ago. She used the funds to pay her legal bills, her apartment, and family gifts. Plaintiff testified that she kept the funds from the inherited annuities and IRA separate.
Plaintiff testified that the parties own two real properties being 1 Lexington and 7 Lexington, which were bought with marital funds during the parties' marriage. Plaintiff testified that both parties are on the deed to 1 Lexington, which was currently occupied by Defendant and that she had not occupied that property since October 2020. Plaintiff testified that prior to October 2020, the parties had resided at 1 Lexington for approximately 30 years. Plaintiff left 1 Lexington because she felt physically and mentally unsafe due to Defendant. Plaintiff described Defendant as volatile, dysfunctional, and threatening. According to Plaintiff, Defendant would stay up all night, disrupt the household by moving things, and scream at her daily. She was not permitted to speak with Defendant, she was not permitted to be in the same room as Defendant, and there were physical fights between them. Plaintiff testified that the physical violence included things being thrown and broken. In addition, on one occasion, Defendant placed a pillow over Plaintiff's head after having thrown her on the bed. Plaintiff testified that during the years 2020 through 2022, the police were called to the residence approximately 20 due to Defendant's behavior. 
Plaintiff testified that 1 Lexington has been greatly damaged, mostly inside and some outside. According to Plaintiff, the walls are broken inside with holes, the walls have been painted with strange colors, and that Defendant ruined the home. Plaintiff testified that 1 [*18]Lexington is currently in foreclosure as the parties owe Citibank $240,000.00, arising out of an equity loan that Defendant insisted upon. Plaintiff believed the home will need to be sold to pay the debt.
Plaintiff testified that 7 Lexington is titled under [redacted]LLC, which is an entity that Defendant owns. Its purchase was funded with marital funds and a loan against 1 Lexington. Plaintiff testified that 7 Lexington was purchased with the intent to renovate it and flip it. Plaintiff is requesting that the Court provide her the authority to prepare the two properties for sale and to sell them, so that all debts may be repaid.
Plaintiff asked to be awarded exclusive occupancy of both real properties, and that Defendant be vacated from both properties. Plaintiff testified that she is asking that she be permitted to work with the Receiver to sell the two properties. She is also asking that the Court authorize the Receiver to satisfy any outstanding debts associated with the properties from their sale, and that she be awarded any net proceeds because Defendant dissipated so many marital assets. Plaintiff testified that she requested that Defendant be solely responsible for all costs of the Receiver due to his failure to comply with court directives that resulted in the Receiver's appointment.
Plaintiff is asking that the Court award each party sole right to any financial accounts held individually in each name. Plaintiff was unaware of any accounts held jointly by the parties, but to the extent such accounts exist, she asked that the funds be split between them, and the accounts closed. Plaintiff requested that the Court permit her to retain sole interest, respectively, in any of their individual retirement accounts. Plaintiff requested a money judgment for the shortfall of the 50:50 distribution that the parties' agreed to in the May 2023 Stipulation regarding the Fidelity account ending in 5287 in the amount of $214,712.00. With respect to the other Fidelity accounts titled individually in Defendant's name, Plaintiff asked that the Court allow Defendant to retain sole interest. Plaintiff requested that the Court require each party to be solely responsible for all credit card debt and lines of credit in their respective names. Plaintiff testified that with respect to the home equity line of credit attached to 1 Lexington, the Court authorize her to satisfy that debt from 1 Lexington's sale proceeds. Plaintiff requested that neither party be required to pay spousal support or maintenance to the other.
Plaintiff testified that the parties owned [redacted], Inc., which was incorporated in 2000 or 2001, with each party having a 50% ownership interest. Following the entity's incorporation, Defendant significantly assisted Plaintiff in organizing the company and getting the company started, but that during the following years, Plaintiff explained that she engaged in 80% of the work associated with the company along with its employees. Plaintiff testified that the company was engaged in recruitment for pharmaceutical industries and the compensation was fully commission-based. Plaintiff explained that each client would take four to eight months to close, requiring that she obtain the client, develop the client, get the candidate, work with the candidate, and then close the deal, which would then be followed by Defendant doing the billing. Plaintiff testified that the parties worked together in this manner for 20 years. Plaintiff stopped working with the company in December 2020 because she did not have access to company funds, and Defendant was utilizing these funds.
Plaintiff testified that during their marriage, Defendant controlled the finances. He collected both parties' paychecks. Plaintiff requested money from Defendant when needed. Plaintiff's annual income ranged from $100,000.00 to $600,000.00. Plaintiff testified that she would work 15 to 40 hours per week. Prior to forming [redacted], Inc., Plaintiff worked for a [*19]recruitment firm for almost 10 years, and prior to that, Plaintiff worked part-time in a consulting position pertaining to human resources at a publishing house.
Plaintiff was the primary caregiver for the parties' children until the children reached junior year in high school at which time Defendant remained at home. Plaintiff remained active in the children's lives. Plaintiff testified that she remains in daily contact with her children, and she is unaware if Defendant has any communication with them. Plaintiff testified that Defendant has had a lot of altercations with their children following the parties' separation, and they removed themselves from him.
Plaintiff is requesting that the Court permit her to close the business and business accounts as it is defunct.
Plaintiff testified that the balance of Fidelity account ending 4277 as of December 2021 was $265.16, which had deposits for that year totaling $205,000.00 and withdrawals totaling $203,298.28. Plaintiff testified that this account is titled in Defendant's name, she does not have access to this account, and the account was funded during the parties' marriage. Plaintiff testified that the balance of this account was $53,243.18 as of January 1, 2022, and the balance was $3,178.47 as of June 30, 2023.
Plaintiff testified that the Fidelity account ending 3260 was funded during the parties' marriage, it was titled in Defendant's name, that she had no access to the account, and it had a balance as of June 30, 2022, of $0.05. Plaintiff testified that the balance of all Fidelity accounts as of the date of commencement was $1,925,186.00, and that during the pendency of this action, Defendant depleted $1,854,689.00.
Plaintiff's Exhibit #12A was admitted into evidence on consent. Plaintiff testified that between September 1, 2021, and September 30, 2023, she incurred and paid $285,066.35 to the Law Office of Miller Zeiderman, LLP for her legal fees connected with this action. Plaintiff stated that this sum did not reflect the additional services performed through November 2023. Plaintiff's Exhibit #12B was admitted into evidence on consent.
Plaintiff testified that during this action she was awarded a $35,000.00 money judgment against Defendant for legal fees she incurred in this action, but Defendant did not pay. Then, during this action, Plaintiff was awarded an additional $35,000.00 for legal fees she incurred in this action to be paid by Defendant, which he also did not pay. Plaintiff requests that the Court reduce that award to a money judgment. Plaintiff's Exhibit #14 was moved into evidence on consent.
Plaintiff's Exhibit #12E was admitted into evidence on consent. Plaintiff testified that prior to retaining the Law Office of Miller Zeiderman, LLP in September 2021, she had retained Ken Novenstern from Fall 2020 through September 2021. Plaintiff testified that during this period, she incurred and paid to Ken Novenstern $50,671.84. Plaintiff stated that the total legal fees she incurred in this action between Fall 2020 and September 20, 2022, were $335,738.19. Plaintiff requested that Defendant pay 80% of her legal fees, in addition to the $35,000.00 judgment, resulting in Defendant paying Plaintiff as and for her legal fees incurred in this action $212,590.56. Plaintiff felt this award was appropriate, explaining that she was forced to overpay due to Defendant's failure to take the action seriously, to appear in court, to comply with court orders, to produce discovery, and to cooperate with the Receiver.
Plaintiff tried to resolve the divorce without litigation. This included initial efforts to schedule a meeting with the parties and their then-legal counsel, which did not occur because Defendant refused. Plaintiff testified that thereafter, many attempts were made to settle the [*20]litigation, but those efforts proved unsuccessful as Defendant either failed to respond or he presented a counteroffer that Plaintiff felt made no sense. Plaintiff testified that Defendant has had three different attorneys, and she was forced to request the appointment of a receiver due to Defendant's conduct. Plaintiff stated that the Receiver was then forced to obtain a court order to facilitate appraisals of the real properties due to Defendant's conduct.
Plaintiff's Exhibit #12D was admitted into evidence. Plaintiff testified that following his appointment in this action, the Receiver incurred $12,654.80 in fees, which, while subject to this Court's approval, are accepted by her. Plaintiff requests that Defendant be solely responsible for the Receiver's fees due to Defendant's non-compliance and bad faith. Plaintiff would accept the Court's continued appointment of the Receiver to facilitate the sale of the real properties and distribution of accounts.
Plaintiff testified that her healthcare coverage is Medicare plus Global Life Company of New York, and her prescription plan was from United Healthcare. Plaintiff testified that no one else is covered under her health insurance plan, and she is unaware if, or how, Defendant is insured. Plaintiff testified that she would like the Court to require each party to be responsible for their own health insurance coverage.
With respect to the contents of 1 Lexington, Plaintiff is asking that the Court provide Defendant the opportunity to remove whatever items he wishes prior to the date he is directed to vacate the property, and any items remaining after that date are awarded to her. Plaintiff asked that the only exception would be the family photos, which she would like left in the property for her so that she may take what she would like and provide the remainder to Defendant. Plaintiff testified that she is asking that the Court award jewelry and personal property in the possession of each party to that party. 
Plaintiff leases a Lexus NX300, and she asked the Court to direct that she be responsible for any expenses associated with that vehicle. Plaintiff believes Defendant owns two vehicles — a Cadillac SUV and a Chevy Volt. Plaintiff asked the Court to direct that Defendant be responsible for any expenses associated with those two vehicles.
Plaintiff's counsel requested that the Court conform the pleadings in this matter to the proof, which was granted without objection.
Plaintiff's Exhibit #12C was admitted into evidence on consent. Plaintiff testified that it was her retainer agreement with her prior counsel, Kenneth Novenstern, which she executed on September 23, 2020, after which, Mr. Novenstern represented her in this action. Plaintiff testified that she has complied with all financial disclosure directives and all court orders and has cooperated with the Receiver.
Cross Examination -
Plaintiff's maiden name was M.C.D. She married Defendant on December 3, 1983, in a religious ceremony in Braintree, Massachusetts. She suffers from post-traumatic-stress disorder ("PTSD"), for which she sees a therapist and takes medication. Plaintiff testified that during the marriage, she had taken medication to help with sleep and she takes Prozac. Plaintiff left the parties' marital domicile as of the date of the first billing of her initial legal counsel. When asked about the balance of Chase checking account ending 1159, Plaintiff testified that she was unaware of the current balance. Plaintiff testified that in 2021, her income was nearly $500,000.00 of which she took home $260,000.00. That income was derived from [redacted] and her new company. Plaintiff testified that her ownership interest in [redacted]is 50%, but that Defendant controlled the finances with Michael Panzerino, who was Defendant's accountant who [*21]had prepared the parties' tax filings for approximately 20 years. Plaintiff testified that she met with Michael Panzerino approximately six times. Plaintiff testified that from 2000 to 2020, she signed her tax returns. Following the commencement of this action, Plaintiff hired accountant Jeffrey Miller.
Plaintiff testified that Defendant was the CFO of [redacted] and he failed in the last two years. Plaintiff testified that she is not currently employed. During the parties' marriage, Plaintiff had a successful business, and Defendant did a little work outside the home as Plaintiff was the primary breadwinner. Plaintiff testified that [redacted] did have employees for a period. Plaintiff was unaware how Defendant paid his living expenses. Plaintiff testified that she initially assisted with the renovations of 7 Lexington, but stopped because Defendant was abusive to her and "impossible to be with".
b. Defendant's Testimony
Direct Examination -
Defendant resides at 1 Lexington. He admitted he failed to comply with all of the Court's Orders. He testified that he was aware of the Court Order appointing the Receiver, and although he did not agree with that appointment, he stated he had complied. Defendant testified that he did not intend to vacate 1 Lexington in the event the Court directs it. Defendant testified that he complied with discovery in this case when he was represented by counsel. Defendant stated that he had met with attorneys, but none would take his case.
When asked if he threatened Plaintiff during this litigation, Defendant admitted he had verbally multiple times. When asked how many times, Defendant responded: "I can't remember. As my son said at his brother's wedding, [redacted]'s go from 60 to zero. Don't listen to the words. Listen to what's in the heart." Defendant then characterized himself as a "mean fighter" and a "street fighter." Defendant testified that he was angry with Plaintiff because she had thrown up every roadblock, wasted money, and been exploited by lawyers. Defendant maintained that he has wasted money during this litigation on every attorney he hired. Defendant then testified, contrary to his prior testimony at the Inquest, that he did not violate any court orders. Defendant testified that Plaintiff would not settle.
Plaintiff's counsel then made an application, based upon Defendant's testimony, for the Court to enter an Order of Protection in Plaintiff's favor and against Defendant, directing Defendant to stay away from Plaintiff and the parties' two real properties. The Court reserved decision on the application until the next date of Inquest but directed the parties to cease all communication with each other. Defendant then made an application for an order of protection and an order of support, which were denied.
Admitted into evidence on consent, Plaintiff's Exhibit #15 was a May 26, 2023 e-mail sent by Defendant to Plaintiff's counsel sending Defendant a copy of a subpoena. Defendant read the e-mail aloud (NYSCEF Doc. No. 360 at 36-37):
Danny, show some respect to your country and those who fight to protect your rights. This is Memorial Day Weekend. We celebrate those who fought and died so you can write emails and issue subpoenas and disturb this beautiful Friday and celebrate Ms. Zeidenberg's greed.
I was married 37 years and together over 40 years when the plaintiff filed her divorce action. We have two grown sons, your age or perhaps older. Mr. Kenneth Novenstern, her first [*22]attorney, and a knave of the highest order, said M.R. wished for a quick and amicable split. This is what I attempted to give her. Often times, under the most deplorable conditions, corrupt and deceitful, often overtly and intentionally cruel. Implemented simply and set to  simply and set to inflict pain to hurt me.
Is that why you spent mommy and daddy's hard-earned money in order to go to law school and to be a matrimonial attorney in a corrupt county court filled with common crimes, yet disguised in suits and ties, black dresses and flowing black robes? Think about it. You still have the opportunity to not grow old as your boss has. It won't, I suspect, earn you a place in heaven.
Have a nice weekend. I'll entrust you'll enjoy it wisely and safely.
Respectfully, [D.R.].
Postscript, P.S., and * * * like I told Judge Hyer, I believe that's you, I've retained counsel. I'm not an attorney and have not been provided one, as my right. You must remember that tenet from law school. I've not been given the right to discovery while being represented ethically by counsel.
Plaintiff's Exhibit #16 was admitted into evidence on consent. Defendant testified that this was an e-mail he sent to Plaintiff's counsel on June 1, 2023 in response to a May 30th e-mail sent to him. When asked how many funds he had spent from 2020 to the date when the date of entry of a court order that restrained his use of financial accounts, Defendant testified (NYSCEF Doc. No. 360 at 39-40):
I spent hundreds of thousands of dollars to continue the construction of the property that [redacted] owns, Seven Lexington Drive, a property that's real estate being held for sale or development. I spent hundreds of thousand  at least a hundred thousand dollars in paying taxes on that property. I paid the household expenses of One Lexington Drive, the taxes, the utility bills, the maintenance, the gardeners, also significant amounts of money. The funds that had been earmarked for that purpose, lines of credit, were also pulled from me. So I had to deplete  I had to, much to my consternation, deplete my retirement savings.
At the outset, I was able to withdraw funds from my retirement accounts and under the IRS 60-day rule return those funds, but cash flow became so hamstrung I was not doing that and I depleted my  my retirement funds that I had saved 35 years, to a significant extent, to now they're embarrassingly low.
When asked if Defendant had the Court's permission to expend these funds, Defendant testified, "I didn't need the Court's permission to maintain my home, my property, nor did I think I needed the Court's permission to maintain my standard of living as a citizen of this county and this country" (NYSCEF Doc. No. 360 at 40). When asked if Defendant had Plaintiff's permission to expend these funds, Defendant testified, "Nor did I have her permission for the 37 years previously when I managed the household finances quite satisfactory I believe she will tell you" (NYSCEF Doc. No. 360 at 41). 
When questioned about the Receiver, Defendant testified that he was happy that he was [*23]involved and, "If there is to be a financial Receiver I'm quite happy that it is someone of Mr. Wiederkehr's expertise and ethical values." However, Defendant testified that he had sent an e-mail to Plaintiff's counsel wherein he stated his plan to take legal action against him, which was admitted into evidence on consent as Plaintiff's Exhibit #17. When asked if he had filed any grievances against the Receiver, Defendant testified, "Only with the good Lord and the Rye Ridge Deli" (NYSCEF Doc. No. 360 at 43).
Plaintiff's Exhibit #18 was moved into evidence on consent. It was an e-mail from Defendant to Plaintiff's counsel on August 28, 2023, which read, "You're playing that losing, lying bluff with the wrong Jew. Let's see how it works out with M.S.D., B'ruch Hashem, defendant" (NYSCEF Doc. No. 360 at 44), followed by a second e-mail in the chain from Defendant to Plaintiff's counsel reading (NYSCEF Doc. No. 360 at 45):
You have ignored every correspondence  at that time I was confusing per se and pro se. You have ignored every correspondence the pro se defendant has sent to your office. They taught you at Pace Law that even a self-represented defendant has equal protections under the law, or am I being too generous? You give the law and your profession a bad name, but I presume that causes you little concern as you cash your ill-gotten shekels. [redacted]. That is my Hebrew name.
Defendant testified that he acknowledged that these e-mails were in response to Plaintiff's counsel sending him trial exhibits and reminding him of the deadline to do so. Defendant then testified (NYSCEF Doc. No. 360 at 47):
D.R., the pro se defendant, did not have access to a staff of lawyers as Miss  as the plaintiff did and a law office that operates with much more support services and administrative capabilities than D.R., who, at the time, was trying to work and live and enjoy life, was able to do. So I was not able, nor did I particularly want  I was not able to respond to that reminder from Ms. Zeiderman.
Plaintiff's Exhibit #19 was moved into evidence on consent. When asked about this e-mail that referred to Defendant providing Plaintiff "exposure" in her hometown referring to billboards, Defendant testified that Plaintiff, "would have recognized as my sarcasm and less a threat, more a verbal ," and dismissed the e-mail as being a warning to Plaintiff, "It was just letting  blowing off some steam so that I didn't have to do anything that would hurt my wife and my children's grandmother" (NYSCEF Doc. No. 360 at 48-49). Plaintiff's Exhibit #20 was moved into evidence on consent. Defendant testified that this was an e-mail sent to Plaintiff's counsel.
Plaintiff's Exhibit #21 was moved into evidence on consent. It was a flash drive with two recordings and were played in Court. Defendant then testified that these recordings were voicemails left for his wife, one being on August 25, 2023. The recordings provided the following statements of Defendant:
Recording #1:
"Ms. [redacted], you might also remember that I have your pharmaceutical records, your drug use, your prescriptions. I also have the papers you stole from Al Marcus when you formed your company. You wanna go to fucking jail? You wanna give up all your money? Keep fighting with me M.R. And by the way your cousins are going to jail for tax evasion. You tried [*24]to destroy me, now I'm going to vaporize the skank from Boston. Have a lovely day and please don't get back to me-and you will-bye bye and leave me alone-get a life-its sad what you've done to yourself and what you've become-a sad sad woman you are. Good luck. Hopefully you'll find peace somewhere."
Recording #2:
"Today is your final day M.R. to propose a settlement that is fair and equitable. Otherwise what happened to [redacted] will happen to you starting with your medical records. I will-do not make me do this. End this today or I will end it."
Defendant testified that he has personal and medical records of Defendant for the period 1981 to present.
Defendant testified that he never signed an authorization allowing Plaintiff's counsel to obtain information from the Department of Treasury related to bonds, noting, "Because I wanted to eat and pay my rent and live like a dignified human being." Defendant testified that he cashed in savings bonds in an amount he could not recall and that savings bonds still existed. Defendant was aware of the Court's directive that he was to sign an authorization for Plaintiff's counsel to obtain information pertaining to the savings bonds, but he had refused to sign the authorization up to the date of the Inquest. Defendant stated at the Inquest that he would agree to sign the authorization due to his apparent belief that no funds could be accessed at that time from the savings bonds, "I would sign it because what remains in that treasury account is the bond deposit that was made in calendar year 2023, which is the present year, which is not able to be withdrawn by myself or anyone else to the one-year anniversary as per United States Treasury laws."
Defendant Statement -
In lieu of a cross examination of himself, Defendant was permitted to make a statement. Defendant asserted that he loved Plaintiff, who he referred to as a good wife, a great mother, and his queen. Defendant acknowledged that the parties' divorce had been difficult. He noted that he would be eternally apologetic and sorry as he wished Plaintiff happiness and serenity. While Defendant testified that, "I've kept records of every day of every year during this process," he continued that, "And I have no case to present." Defendant did note he was interested in resolving this matter (NYSCEF Doc. No. 360 at 66):
The only thing I would like to add, your Honor, is the fact that within the last month or two, subsequent to our prior hearing, Anna and myself sent two emails to Ms. Zeiderman expressing our willingness, and I did one personally, expressing my willingness and eagerness to bring this to an amicable end, to end the fighting and to equitably divide the baby in half with fairness and justice. I've been guided by one principle. It was the principle that I learned in Hebrew school that I said when I eulogized my father 50 years ago. King Solomon said a man's good name is more valuable than the most precious oils. I just want my name and my reputation intact and I want us to go on our ways. The end.
c. Testimony of Receiver Evan Wiederkehr, Esq.
Direct Examination -
The Receiver testified that he is the court-appointed receiver in this action, having been appointed with a preliminary role related to Defendant's receipt of distributive share of a Fidelity account. That role was expanded to include the parties' two real properties — 1 Lexington and 7 Lexington. He testified that since his appointment, Plaintiff has cooperated with him in all aspects.
The Receiver testified that he had visited 1 Lexington. He described the property as poorly kept with writing and painting on walls, as well as holes in walls and doors. Defendant permitted him to access the property with a realtor, Nancy Kennedy. When the Receiver "sought to get back in or to get access for an appraiser, D.R. made clear that there would be no other entry into the residence" (NYSCEF Doc. No. 360 at 5). According to the Receiver, a formal appraisal of the property was not done during his tenure, and it was due to Defendant (NYSCEF Doc. No. 360 at 5-6). 
The Receiver testified that he had visited 7 Lexington. He described it as "an in-construction property," being "probably 70 to 75 percent complete, structurally completed. Finishing work remains outstanding" (NYSCEF Doc. No. 360 at 6).
According to the Receiver, the parties hold 1 Lexington jointly in title and the property is encumbered by a home equity line of credit ("HELOC") that is presently the subject of a foreclosure action in Westchester County Supreme Court. The summary judgment motion in that foreclosure action was denied. The Receiver testified that the HELOC names both parties as borrowers, is held by the lender Cenlar, and consists of original principal balance of $173,000.00, which now has a payoff of approximately $225,000.00. He testified that it is his understanding that Plaintiff has retained separate counsel to defend her in that litigation. He testified that 7 Lexington is titled in the name of [redacted], LLC and not encumbered to his knowledge.
He testified that the predominant factor in being unable to ready these properties for sale has been Defendant's failure to vacate them. The Receiver explained that he and the realtor had toured both properties. According to the Receiver, 1 Lexington would require considerable capital to repair with a current approximate value of $450,000.00 and with repairs at a value in "the high sevens." He testified that 7 Lexington, in its current state, had a value in the "mid sevens" and if the work was completed, in the "mid to high nines."
The Receiver testified that he was unaware of the cost to complete repairs on the properties because he had never had estimates done as he has had no access to funds to complete those repairs. He did not believe the repairs could be completed if Defendant remained in, and currently in possession of, both properties. He stated that Plaintiff's Exhibit #12D were the Receiver's invoices, setting forth the time and services he had rendered since his appointment. Plaintiff's Exhibit #12D was moved into evidence on consent. The Receiver did not think real estate taxes had been paid either property, and he did not have access to funds to pay them.
Cross-Examination -
The Receiver admitted that he did not go to the town or village offices to determine if the real estate taxes were paid, and he agreed it was possible that they were paid.
Findings of Fact & Conclusions of Law
a. Defendant's Capacity and Possible Appointment of a Guardian Ad Litem
As a preliminary matter, there was a request for the appointment of a guardian ad litem for Defendant set forth within Motion Sequence #2; however while that application was withdrawn, the Court acknowledges its continuous obligation to protect the interests of those parties who may be impaired or incapacitated in actions and proceedings pending before the Court. Thus, the Court must address the issue of Defendant's capacity.
New York State Civil Practice Law and Rules ("CPLR") § 1202 provides a mechanism whereby trial courts may appoint guardian ad litem following receipt of a motion or sua sponte:
(a) By whom motion made. The court in which an action is triable may appoint guardian ad litem at any stage in the action upon its own initiative or upon the motion of: 1. an infant party if he is more than fourteen years of age; or 2. a relative, friend or a guardian, committee of the property, or conservator; or 3. any other party to the action if a motion has not been made under paragraph one or two within ten days after completion of service.
(b) Notice of motion. Notice of a motion for appointment of a guardian ad litem for a person shall be served upon the guardian of his property, upon his committee or upon his conservator, or if he has no such guardian, committee, or conservator, upon the person with whom he resides. Notice shall also be served upon the person who would be represented if he is more than fourteen years of age and has not been judicially declared to be incompetent.
(c) Consent. No order appointing guardian ad litem shall be effective until a written consent of the proposed guardian has been submitted to the court together with an affidavit stating facts showing his ability to answer for any damage sustained by his negligence or misconduct.
CPLR § 1203 further provides, "No judgment by default may be entered against an infant or a person judicially declared to be incompetent unless his representative appeared in the action or twenty days have expired since appointment of a guardian ad litem for him. No default judgment may be entered against an adult incapable of adequately protecting his rights for whom guardian ad litem has been appointed unless twenty days have expired since the appointment."
The Appellate Division Fourth Department noted the requirement of CPLR § 1201 and CPLR § 1203 being applied together:
In Oneida Nat. Bank & Trust Co. of Cent. NY v. Unczur (supra, pp. 483—484, 326 N.Y.S.2d 458) we held that sections 1201 and 1203 of the CPLR: "are to be read together and interpreted as requiring the appointment of a guardian ad litem in every case where the defendant is an adult incapable of adequately protecting his rights, before a default judgment may be entered against him. With respect to infant defendants for whom no guardian ad litem has been appointed, the courts have long held that no jurisdiction was acquired and that judgments obtained in such actions are void (see Ingersoll v. Mangam, 84 NY 622; State Bank of Albany v. Murray, 27 AD2d 627, 275 N.Y.S.2d 985). The same rule should be applied with respect to an adult incompetent (see Rakiecki v. Ferenc, 21 AD2d 741, 250 N.Y.S.2d 102). This places the burden upon a plaintiff who has notice that a defendant in his action is under mental disability, to bring that fact to the court's attention and permit the court to determine whether guardian ad litem should be appointed to protect such defendant's interests.
(Sarfaty v Sarfaty, 83 AD2d 748, 749 [4th Dept 1981]).
A party's burden to notify the court about a party who may be under a disability that would require the appointment of a guardian ad litem so as to provide the court an opportunity to investigate the possible appointment of a guardian ad litem is triggered once the party has notice that another party is under a mental disability even if it does not have sufficient proof to make a motion for the appointment of a guardian ad litem (see State v Getelman, NYLJ, Sept. 7, 1993, at 26 [Sup Ct, Albany County 1993]). Once the court has notice of a party who, through mental disability or other impairment, may require the appointment of a guardian ad litem, the court is obligated to diligently investigate to determine if such an appointment will be made.
The appointment of a guardian ad litem is warranted if a party is determined to be incapable of adequately prosecuting or defending her rights (see Nancy C. v Alison C., 57 AD3d 986, 987 [2d Dept 2008]). The burden of proof for an appointment was clearly articulated in a decision entered by the New York City Civil Court which this Court is guided by:
Balancing these concerns, guardian ad litem is justified when, based on a preponderance of the evidence, the court concludes that a party's condition impedes her ability to protect her rights. See Kalimian v. Driscoll, N.Y.L.J., July 20, 1992, at 23. To be "substantial" enough evidence, Palaganas v. D.R.C. Industries, 64 AD2d 594, 407 N.Y.S.2d 170, or to "tend [ ] to show" that a party is unable to protect her rights, Urban Pathways v. Lublin, 227 AD2d 186, 642 N.Y.S.2d 26; Casey J., 251 AD2d 1002, 674 N.Y.S.2d 239, the evidence must be at least "a mere preponderance." Addington v. Texas, 441 U.S. at 423, 426, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323.
(New York Life Ins. Co. v V.K., 184 Misc 2d 727, 734 [Civ Ct, NY County 1999]). 
The Appellate Division Second Department affirmed a trial court's decision not to appoint guardian ad litem, underscoring that a party's incapacity to engage in litigation will not merely turn on a medical condition or diagnosis:
Contrary to the mother's contention, the Family Court did not err in failing to, sua sponte, appoint guardian ad litem for her. The record demonstrates that, despite her mental retardation, the mother was capable of understanding the proceedings, defending her rights, and assisting counsel (see CPLR 1201; Matter of Shawndalaya II., 31 AD3d 823, 824—825, 818 N.Y.S.2d 330; Matter of Justice T., 19 AD3d 1079, 1080, 796 N.Y.S.2d 479; Matter of Philip R., 293 AD2d 547, 548, 740 N.Y.S.2d 421; Matter of Casey J., 251 AD2d 1002, 674 N.Y.S.2d 239; cf. Anonymous v. Anonymous, 256 AD2d 90, 91, 681 N.Y.S.2d 494).
(In re Barbara Anne B., 51 AD3d 1018, 1019 [2nd Dept 2008]).
Here, this Court recognizes the importance of the courts to protect litigants who are impaired requiring the appointment of a guardian ad litem, but it does not believe Defendant to be such an individual. The Court acknowledges the allegations of Defendant's impairment within Motion Sequence #2, that this application was withdrawn, and that no further applications in this action were made for the appointment of a guardian ad litem for Defendant. The Court further recognizes that regardless of such application being made, it has the inherent duty to protect litigants who are impaired or impacted by acting sua sponte.
At the time Motion Sequence #2 was filed, Defendant was represented by counsel, and [*25]thereafter, he was represented by separate counsel. At no time did either counsel raise concerns about Defendant's ability to proceed in this matter without the appointment of a guardian ad litem and/or guardian. Moreover, since being assigned to preside over this matter, this Court has observed Defendant at multiple appearances and during the Inquest, and has determined that it was not, and would not be, warranted to appoint a guardian ad litem for Defendant. Based upon its own observations of Defendant, the Court determined that Defendant could understand the proceedings, defending his rights, and assisting counsel to the extent he decided to retain counsel, and that the difficulties Defendant experienced in this proceeding arose out of Defendant's own misconduct rather than because of impairment and/or incapacity. Thus, the appointment of a guardian and/or guardian ad litem was not, and is not, required here (see In re the Estate of Venezia, 2 Misc 3d 1008[A] [Sur Ct, Kings County 2004]) (denying plaintiff's motion for guardian ad litem for defendant based on allegations that defendant lacked mental capacity and had engaged in unnecessary litigation; court found that although defendant "may be cantankerous and litigious, he certainly does not appear to be incompetent or unable to adequately protect his rights.").
b. Defendant's Statements -
Pursuant to Part 130 of the Rules of the Chief Administrative Judge, the court may impose sanctions upon a party upon either motion or upon its own initiative for frivolous conduct which includes action undertaken to harass or maliciously injure another:
(a) The court, in its discretion, may award to any party or attorney in any civil action or proceeding before the court, except where prohibited by law, costs in the form of reimbursement for actual expenses reasonably incurred and reasonable attorney's fees, resulting from frivolous conduct as defined in this Part. In addition to or in lieu of awarding costs, the court, in its discretion may impose financial sanctions upon any party or attorney in a civil action or proceeding who engages in frivolous conduct as defined in this Part, which shall be payable as provided in section 130-1.3 of this Part. This Part shall not apply to town or village courts, to proceedings in a small claims part of any court, or to proceedings in the Family Court commenced under Article 3, 7 or 8 of the Family Court Act.
(b) The court, as appropriate, may make such award of costs or impose such financial sanctions against either an attorney or a party to the litigation or against both. Where the award or sanction is against an attorney, it may be against the attorney personally or upon a partnership, firm, corporation, government agency, prosecutor's office, legal aid society or public defender's office with which the attorney is associated and that has appeared as attorney of record. The award or sanctions may be imposed upon any attorney appearing in the action or upon a partnership, firm or corporation with which the attorney is associated.
(c) For purposes of this Part, conduct is frivolous if:
(1) it is completely without merit in law and cannot be supported by a reasonable [*26]argument for an extension, modification or reversal of existing law;
(2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or 
(3) it asserts material factual statements that are false.
Frivolous conduct shall include the making of a frivolous motion for costs or sanctions under this section. In determining whether the conduct undertaken was frivolous, the court shall consider, among other issues, (1) the circumstances under which the conduct took place, including the time available for investigating the legal or factual basis of the conduct; and (2) whether or not the conduct was continued when its lack of legal or factual basis was apparent, should have been apparent, or was brought to the attention of counsel or the party.
(d) An award of costs or the imposition of sanctions may be made either upon motion in compliance with CPLR 2214 or 2215 or upon the court's own initiative, after a reasonable opportunity to be heard. The form of the hearing shall depend upon the nature of the conduct and the circumstances of the case.
(see 22 NYCRR § 130-1.1).
"Offensive and abusive language by attorneys in the guise of zealous advocacy is plainly improper, unprofessional, and unacceptable (see, Annotation, Attorney's Verbal Abuse of Another Attorney as Basis for Disciplinary Action, 87 ALR3d 351 [1978])" (Laddcap Value Partners, LP v Lowenstein Sandler P.C., 18 Misc 3d 1130[A], *7 [Sup Ct, NY County 2007]; see People v Fagan, 104 AD2d 252 [4th Dept 1984] [noting that while the correct resolution of civil disputes is indeed an important goal of our legal system, it may fairly be said that society's primary interest in the resolution of civil disputes is that they be settled in a peaceful, orderly, and impartial manner]; see also Blumberg v Carol O'Neil & Assocs., Inc., NYLJ, June 18, 1999 at 26, col 6 [Sup Ct 1999] [imposing sanctions against plaintiff's counsel for "numerous personal, unprofessional, demeaning attacks" directed at defendant's counsel, both in correspondence and during a deposition]). In addition to the imposition of sanctions, a court has the authority to hold a party in contempt if they engage in "[d]isorderly, contemptuous, or insolent behavior, committed during its sitting, in its immediate view and presence, and directly tending to interrupt its proceedings, or to impair the respect due to its authority" (Judiciary Law § 750[A][1]).
Based on its review of Defendant's comments made in correspondence with both counsel who have appeared for Plaintiff in this action, as well as with Plaintiff, the Court determines them to be inappropriate and violative of the Court's Rules cited above. Although not taking any action with respect to Defendant's statements, the Court admonishes Defendant and directs that in future submissions to this Court and communications with counsel and/or self-represented litigants, Defendant shall comply with the applicable law and this Court's Rules as is required of all attorneys and self-represented litigants who appear before the Courts of the State of New York.
[*27]c. Grounds for Divorce
Pursuant to New York State Domestic Relations Law § 170(7):
An action for divorce may be maintained by a husband or wife to procure a judgment divorcing the parties and dissolving the marriage on any of the following grounds:
* * *
(7) The relationship between husband and wife has broken down irretrievably for a period of at least six months, provided that one party has so stated under oath. No judgment of divorce shall be granted under this subdivision unless and until the economic issues of equitable distribution of marital property, the payment or waiver of spousal support, the payment of child support, the payment of counsel and experts' fees and expenses as well as the custody and visitation with the infant children of the marriage have been resolved by the parties, or determined by the court and incorporated into the judgment of divorce.
A spouse's statement under oath that the marriage was irretrievably broken for a period of six months is, by itself, sufficient to establish a cause of action for divorce as a matter of law (see Hoffer-Adou v Adou, 121 AD3d 618, 619 [1st Dept 2014]).
Based upon the submissions to this Court, the parties' agreement to proceed with a divorce pursuant to DRL § 170(7) in the Preliminary Conference Order, dated July 1, 2021, filed as NYSCEF Document No. 27, and the testimony and evidence received at trial, Plaintiff's request is granted to the extent that she is seeking that a judgment be entered granting a divorce in her favor and against Defendant, dissolving forever the bonds of matrimony existing between Plaintiff and Defendant upon the grounds of the Irretrievable Breakdown of the Relationship pursuant to DRL § 170(7).
d. Plaintiff's Request for an Order of Protection
It is well established that the party seeking an order of protection has the burden of establishing by a preponderance of the evidence that the party for which the order is seeking to restrain has committed the alleged family offense, and whether a family offense has been committed is a factual issue to be resolved by the court, and its determinations regarding the credibility of witnesses are entitled to great weight (see Susan WW. On Behalf of Karri-Ann WW. v Alan WW., 161 AD3d 1249, 1250 [3d Dept 2018]; see also Family Court Act § 812). In a family offense proceeding, to establish that the husband committed the family offense of disorderly conduct, the wife was required to prove that the husband's conduct was committed with the intent to cause, or recklessly posed a risk of causing, public inconvenience, annoyance, or alarm (see Cassie v Cassie, 109 AD3d 337, 344 [2d Dept 2013]).
The Court turns to Plaintiff's application that this Court issue a permanent Order of Protection with the same terms and conditions of the Temporary Order of Protection dated November 6, 2023, as well as the additional provisions that Defendant vacate and stay away from the Marital Residence and the Investment Property for a period of one (1) year following the Judgment of Divorce. While Defendant's testimony at Inquest characterized Plaintiff as a good wife, a great mother, and his queen who he wished happiness and serenity, his conduct [*28]towards Plaintiff prior to and during this litigation paints a different picture wherein Plaintiff has been subjected to a pattern of domestic violence by Defendant.
The Court recognizes that domestic violence involves misconduct beyond physical violence and in this action, the Court determined Plaintiff's testimony to be credible to establish that she has survived domestic violence by Defendant on multiple levels including physical, verbal, emotional, and financial. Defendant's attempts to exert power and control over Plaintiff have unfortunately continued throughout this litigation, compelling her to incur significantly more legal fees than otherwise would be required due to Defendant's repeated failures to comply with court orders, appear at court appearances, and cooperate with the court-appointed Receiver. Further, Defendant left harassing voicemails for Plaintiff during this litigation, threatening to humiliate her by posting information about her in billboards in her hometown, to disseminate her confidential medical records, and to engage in actions seeking to incarcerate her and her family members. While Defendant largely acknowledged his conduct, he appeared to show no remorse or intent to cease from such behavior in the future.
Based upon the submissions made to this Court, along with the testimony and evidence received at the Inquest, Plaintiff's request is granted to the extent that this Court has determined that Plaintiff has met her burden for this Court to conclude that Defendant has committed a family offense of disorderly conduct against Plaintiff having found that Defendant's conduct was committed with the intent to cause, or recklessly posed a risk of causing, public inconvenience, annoyance, or alarm. Therefore, this Court shall enter an Order of Protection for the benefit of Plaintiff against Defendant, restraining Defendant for a period of one year which shall terminate on March 20, 2025, in the following manner:
[D.R.] (DOB xx/xx/1954) shall observe the following conditions:
a. Stay away from M.R. (DOB: xx/xx/1953)
b. Stay away from the home of M.R. (DOB: xx/xx/1953)
c. Stay away from the business of M.R. (DOB: xx/xx/1953)
d. Stay away from the place of employment of M.R. (DOB: xx/xx/1953)
e. Stay away from the marital properties of M.R. (DOB: xx/xx/1953), located at 1 Lexington Drive, [redacted], and 7 Lexington Drive, [redacted] as of April 17, 2024.
f. Refrain from communication or any other contact by mail, telephone, e-mail, voicemail, social media or other electronic or any other means, with M.R. (DOB: xx/xx/1953).
g. Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless [*29]endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion, unlawful dissemination or publication of intimate image(s) or any criminal offense against M.R. (DOB: xx/xx/1953).
h. Refrain from posting any material, directly or indirectly, on social media, the internet or any other medium that disparages, embarrasses, criticizes, denigrates, or otherwise seeks to interfere with the employment of M.R. (DOB: xx/xx/1953). 

e. Exclusive Occupancy
With respect to post judgment requests for exclusive occupancy, it has been held that the needs of the parties are to be weighed by the trial court (see Parris v Parris, 136 AD2d 685 [2d Dept 1988]). The Second Department Appellate Division has provided instruction about how a trial court shall determine such requests:
Absent an evidentiary inquiry, it is generally an improvident exercise of discretion to award a spouse interim exclusive occupancy of realty unless the interim award is necessary to protect persons or property (see, Hite v. Hite, 89 AD2d 577, 452 N.Y.S.2d 235; see also, Stugard v. Stugard, 122 Misc 2d 571, 471 N.Y.S.2d 442; cf. Delli Venneri v. Delli Venneri, 120 AD2d 238, 507 N.Y.S.2d 855; but see, e.g., Judell v. Judell, 128 AD2d 416, 512 N.Y.S.2d 699). However, denial of matrimonial relief by way of final judgment does not preclude an award of exclusive occupancy of the marital premises (see, Domestic Relations Law § 234, Del Gatto v. Del Gatto, 142 AD2d 545, 530 N.Y.S.2d 584; Maulella v. Maulella, 90 AD2d 535, 455 N.Y.S.2d 103; Stugard v. Stugard, supra), and, because of the opportunity to fully explore the respective circumstances of the parties, a more flexible standard is applicable where a determination concerning possession of property as between the parties is made following a trial (cf., Delli Venneri v. Delli Venneri, supra; Brady v. Brady, 101 AD2d 797, 475 N.Y.S.2d 470, affd. 64 NY2d 339, 486 N.Y.S.2d 891, 476 N.E.2d 290).
* * *
The determination to award exclusive occupancy of realty, even where the court cannot liquidate and divide the asset (see, Kahn v. Kahn, 43 NY2d 203, 401 N.Y.S.2d 47, 371 N.E.2d 809; Brady v. Brady, supra), remains dependent upon the circumstances of each case (see, Domestic Relations Law § 234).
(De Cillis v. De Cillis, 157 AD2d 822, 823-824 [2d Dept 1990]).
The Court has found that Defendant engaged in domestic violence against Plaintiff, warranting the need for the issuance of an Order of Protection in favor of Plaintiff against Defendant. As such, both parties are unable to safely occupy the parties' real properties simultaneously. The Court further recognizes Defendant's pattern of frustrating the court-appointed Receiver's efforts. This behavior cannot continue as the directives of this Decision and Order will need to be implemented without delay.
Based upon the submissions made to this Court, along with the testimony and evidence received at the trial, Plaintiff's request is granted to the extent that Plaintiff is granted exclusive occupancy of both real properties located at 1 Lexington and 7 Lexington, which shall begin on April 17, 2024, at which time Defendant is directed to vacate the both real properties and shall remove any personal property awarded to him in this Decision and Order. To effectuate the terms of this provision, Plaintiff's counsel shall submit to the Court, on notice of settlement to Defendant, a proposed Warrant of Ejectment, within ten (10) days of this Decision and Order.
f. Directives Pertaining to Plaintiff's Medical Records
In New York State, there is a strong public policy favoring the protection of confidentiality of medical records and records pertaining to matrimonial actions. New York State Public Health Law § 2803-c notes that the public policy of the State of New York includes that, "Every patient shall have the right to have privacy in treatment and in caring for personal needs, confidentiality in the treatment of personal and medical records, and security in storing personal possessions" (Public Health Law § 2803-c[3][f]; Randi A.J. v. Long Island Surgi-Ctr., 46 AD3d 74, 75 [2d Dept 2007]). 
Medical records and mental health records are confidential unless the patient waives such privilege or upon very narrow circumstances (see CPLR § 4504; see also Mental Hygiene Law § 3313). The patient may engage in such waiver through written authorization or, in the context of litigation, the patient places privileged information at issue (see Public Health Law § 17; see also Hughson v St. Francis Hosp. of Port Jervis, 93 AD2d 491 [2d Dept 1983]). The statutory privilege of confidentiality of patient records belongs exclusively to the patient and not to any third party (see Mantica v New York State Dept. of Health, 248 AD2d 30, 32 [3d Dept 1988], leave to appeal granted 93 NY2d 802, affirmed 94 NY2d 58 [1999]). Although a surviving spouse may have access to the medical records of a predeceased spouse, a living spouse has no such right without written authorization (see 1 Christopher Realty, LLC v Miller, 24 Misc 3d 1206[A] [Civ Ct, NY County 2009]).
The New York State Legislature has recognized that the confidential relationship that exists during a marriage that may have compelled a spouse appoint the other to act in a fiduciary capacity for such spouse, including having access to confidential records, is often extinguished upon the parties' divorce resulting in the need for the fiduciary relationship to be extinguished as well (see General Obligations Law § 5-1511[2][c] [terminating agent's authority under a power of attorney upon divorce of principal and agent]; see also Public Health Law § 2985[e] [terminating agent's authority under a health care proxy upon divorce of principal and agent]; Public Health Law § 4201[5] [terminating agent's authority under a designation of agent for disposition of remains upon divorce of principal and agent]; Estates, Powers and Trusts Law § 5-1.4 [revokes any revocable provision conferring a power of appointment on the former spouse and any revocable nomination of the former spouse to serve in a fiduciary or representative capacity, such as nomination of the former spouse as a personal representative, executor, trustee, guardian, agent, or attorney-in-fact]).
In the context of matrimonial actions, the use of medical records is limited (see Worysz v Ratel, 101 AD3d 893 [2d Dept 2012]). However, in addition to medical records, the Legislature has recognized the need to protect sensitive information contained within matrimonial actions by [*30]adopting Domestic Relations Law § 235, which restricts the dissemination of documents filed pertaining to a matrimonial action. 
Section 235 of the Domestic Relations Law, which prohibits the taking of copies, or even the inspection, of the records of matrimonial proceedings by anyone other than the parties or their counsel, manifests a clear legislative design that those proceedings be kept secret and confidential" (Shiles v. News Syndicate Co., 27 NY2d 9, 14 [1970]).
The policy behind the rule is that matrimonial matters can involve painful, even embarrassing details, which the parties should have a right to keep private. Absent some overriding importance to the persons who would have access to the file, that privacy should be respected. Moreover, to the extent that the particular matrimonial matter might be subject to media publicity, the statute holds that such potentially embarrassing material should remain private, lest the details be used for spite or for scandal." (Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law C235:1).
(Matter of Madsen v Westchester County Clerk, 43 Misc 3d 1217[A], *3 [Sup Ct, Westchester County 2014]).
Discussing the importance of confidentiality of a party's medical records and the limitations of DRL § 235:
Of further concern to the Court is the potential for improper use by one party of the other party's medical records. In recognition of the sensitive nature of the issues incident to matrimonial litigation, including custody litigation, DRL 235 prohibits public perusal of pleadings, affidavits, findings of fact, conclusions of law, judgments of divorce, agreements of separation, testimony or evidence. The statute further authorizes the Court, in an appropriate case, to exclude the public from the courtroom. The intent of the statute is to protect the parties and/or their children from public disclosure of the intimate details of their marital relationship and insulate them from the potential harm which might result from such disclosure.
There is, however, no statute restricting a party's access to his or her counsel's file. Any jurist or attorney familiar with the emotionally charged atmosphere of matrimonial litigation, evidenced in part by the frequency of family offense proceedings, is keenly aware that an emotionally distraught litigant could misuse such medical records, obtained through pretrial discovery, for example, by providing copies to the other party's employer, friends or family, including the parties' children.
The Appellate Division, Fourth Department (Perry v. Fiumano, supra) and the Appellate Division, First Department (Hickox v. Hickox, supra) have both adopted a general policy limiting pretrial disclosure of confidential medical records. Both departments require that a party's medical records be reviewed by the Court, and that only those portions of the records deemed to be relevant and material be disclosed.
This Court finds the approach taken by the Fourth and First Judicial Departments to be an appropriate accommodation of the public policy intent of the patient-physician privilege, and the need for disclosure relevant and material to the physical, mental and emotional condition of a litigant seeking custody.
(Coderre v Coderre, 1990 WL 312774, *3-4 [Sup Ct, Suffolk County 1990]).
"The practice commentaries appearing in the main volume (at 523-524) point out that Section 235 does not completely provide for privacy of all documents in a matrimonial file, noting that the parties and their counsel have unfettered rights to examine all papers in the court file. In Tornheim v. Blue & White Food Products Corp., 73 AD3d 747, 901 N.Y.S.2d 307 (2d Dept. 2010), the plaintiff complained that the corporate defendant had gained access to the deposition testimony the plaintiff had given in his matrimonial action. The Appellate Division upheld the trial court's refusal to sanction the defendant, observing that the statutory prohibition on dissemination of matrimonial files applies to court employees and not to the litigants and that it was undisputed that the plaintiff's ex-wife had consented to the disclosure" (Alan D. Scheinkman, 2011 Supp Prac Commentary, McKinney's Cons Laws of NY, Domestic Relations Law § 235 at C235:1). 
Recognizing the limitations of DRL § 235, the Appellate Division Second Department has affirmed the right of a trial court to seal an entire matrimonial action file:
Domestic Relations Law § 235(1) protects against "the indiscriminate inspection and publication of the details of matrimonial matter", but leaves open for review the order, decision, or exhibits of the case (Domestic Relations Law § 235[1]; Scheinkman, Practice Commentaries, McKinney's Cons. Laws of NY, Book 14, Domestic Relations Law C235:1, at 119). The sealing provision contained in the order entered February 10, 1997, extended protection from disclosure to include all court decisions, orders, and other documents filed in this action. The order appealed from modified the order entered February 10, 1997, by (1) specifically including within the sealing provision the order entered February 10, 1997, and its underlying decision, and an order of the same court entered June 11, 1997, and its underlying decision, and (2) specifically excluding from the sealing provision the order of the court entered December 24, 1997, and its underlying decision.
Contrary to the appellant's contention, the sealing provision contained in the order appealed from was proper. There was an overriding concern to ensure that one party to the divorce settlement negotiations did not use the otherwise protected scurrilous material extensively referred to and repeated in the sealed documents to gratify private spite or force a desired settlement by threat of disclosure (see, Shiles v. News Syndicate Co., 27 NY2d 9, 14—15, 313 N.Y.S.2d 104, 261 N.E.2d 251, cert. denied 400 U.S. 999, 91 S.Ct. 454, 27 L.Ed.2d 450; Matter of Caswell, 18 R.I. 835, 836, 29 A. 259; United States v. Amodeo, 71 F.3d 1044, 1048—1051).
(Anonymous v Anonymous, 263 AD2d 494, 494-495 [2d Dept 1999]).
The Court finds that there is cause to seal the entire court file pertaining to this action due to Defendant's threats made throughout this proceeding that he will seek to harm Plaintiff through the release of her confidential information, including her financial and medical records. Accordingly, it is hereby ordered that this entire court file shall be sealed.
The Court further finds that as the parties are now divorced, any confidential fiduciary relationship between the parties is now terminated. Therefore, Defendant has no legal basis to [*31]retain Plaintiff's medical records. Accordingly, Defendant shall immediately, upon receipt of this Decision and Order, erase all electronically stored medical records of Plaintiff, and within ten (10) days of receipt of this Decision and Order, turn over to Plaintiff's counsel any hard copies of Plaintiff's medical records. Further, Defendant shall not seek to obtain Plaintiff's medical records utilizing any health care proxy, HIPAA Authorizations, or other documents executed by Plaintiff prior to the commencement of this action.
g. Receiver Appointment & Scope of Power
A court may appoint a receiver pursuant to New York State Civil Practice Law and Rules § 6401, which provides:
(a) Appointment of temporary receiver; joinder of moving party. Upon motion of a person having an apparent interest in property which is the subject of an action in the supreme or a county court, a temporary receiver of the property may be appointed, before or after service of summons and at any time prior to judgment, or during the pendency of an appeal, where there is danger that the property will be removed from the state, or lost, materially injured or destroyed. A motion made by a person not already a party to the action constitutes an appearance in the action and the person shall be joined as a party.
(b) Powers of temporary receiver. The court appointing a receiver may authorize him to take and hold real and personal property, and sue for, collect and sell debts or claims, upon such conditions and for such purposes as the court shall direct. A receiver shall have no power to employ counsel unless expressly so authorized by order of the court. Upon motion of the receiver or a party, powers granted to a temporary receiver may be extended or limited or the receivership may be extended to another action involving the property.
(c) Duration of temporary receivership. A temporary receivership shall not continue after final judgment unless otherwise directed by the court.
"Although the appointment of a temporary receiver is an extreme remedy, which should not be lightly granted," sufficient evidence to support such an appointment will exist when there is evidence of a party's inability, or refusal, to meet the party's financial obligations promptly to the extent that marital property is in danger of being dissipated (Hildenbiddle v Hildenbiddle, 110 AD2d 819, 820 [2d Dept 1985]). Where a party's conduct requires a receiver's appointment, that party may be required to pay all of the receiver's fees (see Somer v Somer, 155 AD2d 591, 596-597 [2d Dept 1989]; see also Wagenmann v Wagenmann, 96 AD2d 534 [2d Dept 1983]).
Here, the Court entered an Order appointing Evan Wiederkehr, Esq. as the court-appointed Receiver. The appointment was necessary due to Defendant's misconduct which placed the parties' marital property in danger of dissipation. The Court finds that such danger of dissipation remains without the continued appointment of the Receiver with the appropriate scope of authority granted as Defendant has testified that he will not comply with the Court's directives pertaining to the properties.
Based upon the submissions made to this Court, along with the testimony and evidence received at the trial, Plaintiff's request is granted to the extent that Defendant shall be solely [*32]responsible for all the Receiver's fees incurred in this action and that a separate Order of Appointment of Receiver shall be entered by the Court simultaneously with this Decision and Order that will provide the following:
1. Evan Wiederkehr, Esq., being appointed to act as court-appointed Receiver whose appointment shall remain in effect until such time as he shall submit to this Court an Affirmation of Services setting forth the services completed as Receiver, that all services have been completed, and requesting that this Court approve fees to the Receiver in an amount set forth within the Affirmation and annexed supporting billing statements.
2. Providing a scope of authority of the Receiver to include the following:
a. With respect to the real properties known as 1 Lexington Drive, [redacted], and 1 Lexington Drive, [redacted] ("Properties"):
i. Engaging in efforts to prepare the Properties for sale, including, but not limited to, completing any renovations and repairs;
ii. Engaging in efforts to list the Properties for sale, including, but not limited to, executing any listing agreements and real estate broker agency disclosures;
iii. Engaging in any efforts to transfer and covey title, including, but not limited to, deeds and transfer documents.
iv. Distributing the funds from the sale of the Properties as set forth herein. 

3. Authorizing the Receiver to file, on notice of settlement to the parties and their counsel, proposed Orders enlarging Receiver's scope of authority to address new issues that may arise following this Decision and Order.
h. Health Benefits and Cash Medical Support
With respect to the health benefits and medical support of parties involved in a matrimonial action:
Pursuant to Domestic Relations Law section 255, both parties are on notice "... that once the judgment is signed, a party thereto may or may not be eligible to be covered under the other party's health insurance plan, depending on the terms of the plan." (DRL 255).
In the event that either party maintains health insurance for the benefit of their spouse, the other party may be entitled to health insurance through a COBRA option, or otherwise may be required to secure their own health insurance. The court cannot award a party to pay the other party's unreimbursed medical expenses (see Bains v. Bains, 308 AD2d 557, 308 AD2d 557, 764 N.Y.S.2d 721 [2 Dept., 2003] "[j]udgments of divorce which direct a parent to pay the other parent's unreimbursed health care expenses are in the nature of open-ended obligations which [*33]this Court has consistently disfavored ... [o]rdinary or routine unreimbursed medical expenses should be considered as included in a maintenance award, and extraordinary unreimbursed medical expenses cannot be awarded prospectively in unfixed amounts' (Gulotta v. Gulotta, 215 AD2d 724, 627 N.Y.S.2d 428 [2 Dept., 1995]; Zabin v. Zabin, 176 AD2d 262, 574 N.Y.S.2d 75 [2 Dept., 1991]")."
(G.K. v L.K., 27 Misc 3dd 1239[A], *19 [Sup Ct, Kings County 2010]).
Based upon the submissions, along with the testimony and evidence received at the Inquest, Plaintiff's request is granted to the extent that following the entry of a Judgment of Divorce dissolving the parties' marriage, each party shall be responsible to maintain and pay for his or her own health insurance coverage and all costs associated therewith without contribution from the other party.
i. Spousal Support and Maintenance
New York State Domestic Relations Law sets forth how spousal maintenance and support shall be calculated, and the duration determined by the court (see Emmanuel D. v Ximena D., 73 Misc 3d 1208[A] [Sup Ct, Kings County 2021]). Further, courts are permitted to award increased spousal support and maintenance to an abused spouse and the subject of domestic violence by the other (see J.N. v T.N., 77 Misc 3d 894 [Sup Ct, NY County 2022]).
This Court recognizes that the focus and purpose of awarding increased maintenance to an abused spouse is different than the focus and purpose of awarding an abused spouse a greater share of marital property. Maintenance is meant to remedy the abused spouse's diminished earning capacity as a result of the abuse and enable them to live a lifestyle similar to that enjoyed in the marriage. Jessica T. v. Kieth T., supra It simply cannot be the case that the equities prohibit the Court from taking into account the actions of an abusive spouse who is intent on ruining the other spouse's professional reputation, career, financial security, and health, simply because they have not yet totally destroyed their partner The fact that Wife is still gainfully employed despite Husband's unabated harassment and abuse should not bar application of DRL § 236 B (5)(d)(14) to this Court's analysis and conclusions as to equitable distribution of assets. Indeed, it is clear from this record that Husband's "main desire seems to be to inflict some sort of harm upon [Wife] in any manner possible as displayed throughout the entirety of this case." Jessica T. v. Kieth T., supra. His harassment did not stop at commencement but has continued and in fact accelerated over the past four years. By all accounts, this is an insidious case of domestic violence, the end of which has yet to be reached. Consequently, this Court is empowered to, and must on this record, find that Husband's acts resulted in "actual ... emotional injury" and has "created a substantial risk of ... emotional harm" to Wife, and has negatively impacted her professional reputation and career and threatened her ability to make a living. DRL § 236 B (5)(14).
(J.N. v T.N., 77 Misc 3d at 933-934). 
Based upon Plaintiff's submissions, along with the testimony and evidence received at the Inquest, as well as in Plaintiff's Post Trial submission, the Court finds that Plaintiff was [*34]subjected to domestic violence by Defendant, resulting in her diminished earning capacity due to Defendant's abuse which would warrant a modification of any award of spousal support made by this Court. Due to Defendant's habitual failure to comply with the discovery directives of this Court, the Court was presented with no evidence at the Inquest from Defendant if an award of spousal support is warranted and if so, in what amount. Notably, at the Inquest, Defendant did not make an application for an award of spousal support from Plaintiff, and in her Post-Trial Submission, Plaintiff requests that neither party be awarded spousal support from the other.
The Court grants Plaintiff's request to the extent that neither party shall receive spousal support or spousal maintenance from the other.
j. Equitable Distribution of Marital Assets & Separate Property Claims.
The Appellate Division, Second Department has noted the way a trial court is to decide equitable distribution in the context of a matrimonial action:
The Equitable Distribution Law mandates that, whenever a marriage is terminated, absent an agreement of the parties, the court must determine the rights of the parties in their separate and marital property and provide for the disposition of the property in the final judgment (see Domestic Relations Law § 236[B][5][a]). In determining the equitable distribution of marital property, the court is required to consider 14 specific factors and may take into account any other factor the court finds just and proper (see Domestic Relations Law § 236[B][5][d]). The court is obligated to render a decision in which it sets forth the factors it considered and the reasons for its decision, a requirement that cannot be waived (see Domestic Relations Law § 236[B][5][g]). In the absence of express findings of fact and of a detailed discussion of the enumerated factors, meaningful appellate review is precluded and a remittal for further fact finding may be required (see Gape v. Gape, 110 AD2d 621, 487 N.Y.S.2d 111; see also Kluge v. Kluge, 159 AD2d 968, 552 N.Y.S.2d 771). Facts must be sufficiently developed at trial to enable a reasoned determination of the issues of equitable distribution and, if not, a new trial may be ordered (see Madu v. Madu, 135 AD3d 836, 837, 24 N.Y.S.3d 678; McLoughlin v. McLoughlin, 74 AD3d 911, 915, 903 N.Y.S.2d 467).
(Kaufman v Kaufman, 189 AD3d 31, 52 [2d Dept 2020]).
The New York State Domestic Relations Law § 236[B][5] notes, in part, that:
b. Separate property shall remain such.
c. Marital property shall be distributed equitably between the parties, considering the circumstances of the case and of the respective parties.
d. In determining an equitable disposition of property under paragraph c, the court shall consider:
(1) the income and property of each party at the time of marriage, and at the time of the commencement of the action;
(2) the duration of the marriage and the age and health of both parties;
(3) the need of a custodial parent to occupy or own the marital residence and to use or own its household effects;
(4) the loss of inheritance and pension rights upon dissolution of the marriage as of the date of dissolution;
(5) the loss of health insurance benefits upon dissolution of the marriage;
(6) any award of maintenance under subdivision six of this part;
(7) any equitable claim to, interest in, or direct or indirect contribution made to the acquisition of such marital property by the party not having title, including joint efforts or expenditures and contributions and services as a spouse, parent, wage earner and homemaker, and to the career or career potential of the other party. The court shall not consider as marital property subject to distribution the value of a spouse's enhanced earning capacity arising from a license, degree, celebrity goodwill, or career enhancement. However, in arriving at an equitable division of marital property, the court shall consider the direct or indirect contributions to the development during the marriage of the enhanced earning capacity of the other spouse;
(8) the liquid or non-liquid character of all marital property;
(9) the probable future financial circumstances of each party;
(10) the impossibility or difficulty of evaluating any component asset or any interest in a business, corporation or profession, and the economic desirability of retaining such asset or interest intact and free from any claim or interference by the other party;
(11) the tax consequences to each party;
(12) the wasteful dissipation of assets by either spouse;
(13) any transfer or encumbrance made in contemplation of a matrimonial action without fair consideration;
(14) whether either party has committed an act or acts of domestic violence, as described in subdivision one of section four hundred fifty-nine-a of the social services law, against the other party and the nature, extent, duration and impact of such act or acts;
(15) in awarding the possession of a companion animal, the court shall consider the best interest of such animal. "Companion animal", as used in this subparagraph, shall have the same meaning as in subdivision five of section three hundred fifty of the agriculture and markets law; and
(16) any other factor which the court shall expressly find to be just and proper.
e. In any action in which the court shall determine that an equitable distribution is appropriate but would be impractical or burdensome or where the distribution of an interest in a business, corporation or profession would be contrary to law, the court in lieu of such equitable distribution shall make a distributive award in order to achieve equity between the parties. The court in its discretion, also may make a distributive award to supplement, facilitate or effectuate a distribution of marital property.
f. In addition to the disposition of property as set forth above, the court may make such order regarding the use and occupancy of the marital home and its household effects as provided in section two hundred thirty-four of this chapter, without regard to the form of ownership of such property.
g. In any decision made pursuant to this subdivision, the court shall set forth the factors it considered and the reasons for its decision and such may not be waived by either party or counsel.
The Court is not required to engage in a "point-by-point catechistic discussion" of each factor under DRL § 236B(5)(d) (see Sykes v Sykes, 43 Misc 3d 1220[A], *4 [Sup Ct, NY County 2014]). "There is no requirement that the distribution of each item of marital property be made on an equal basis (see DeSouza—Brown v Brown, 71 AD3d at 946, 897 N.Y.S.2d 228; Peritore v. Peritore, 66 AD3d 750, 752-753, 888 N.Y.S.2d 72; Griggs v. Griggs, 44 AD3d 710, 713, 844 N.Y.S.2d 351)" (Baumgardner v Baumgardner, 98 AD3d 929, 931 [2d Dept 2012]). If the court determines that one spouse engaged in domestic violence against the other that has impacted the spouse emotionally, financially, and reputationally, the court can provide the spouse who engaged in the domestic violence a decreased distributive award of the martial assets (see J.N. v T.N., 77 Misc 3d at 931-932 ["Husband's verbal and emotional abuse of Wife throughout the marriage constituted harassment — his threats to take custody of the children and degrading comments alarmed her, were made without provocation, and served no legitimate purpose. The prior jurist, upon a complete trial record, expressly found that Husband engaged in "domestic violence of an emotional nature" against Wife, and this Court finds the same. Wife was subject to consistent, persistent verbal and emotional abuse. Husband called her names and degraded her in all aspects of her life. He told her to her face and in front of her family that she was diseased and an unfit parent who could not be around her children. He called her "bitch" and "cunt" at will and then callously blamed her for his despicable speech. As to her professional skills, he called her "different flavors of you're an idiot. You're stupid. You don't know what you're doing." This conduct continues unabated, albeit in a different form, and has the potential for destroying Wife's ability to make a living."]).
It is further appropriate to award a decreased distributive award of the martial assets to a spouse who has engaged in economic misconduct and who has failed to comply with court orders, as noted in one decision:
Defendant's contention that Supreme Court abused its discretion by not distributing the marital assets on an equal basis is not persuasive. Supreme Court considered the statutory factors set forth in Domestic Relations Law § 236(B)(5)(d) and properly reasoned that, had defendant [*35]not defied the court order to account for or return the $275,000, defendant would have been entitled to one half of the marital assets. Supreme Court correctly opined that "[e]quitable distribution is a per se equity action" and that "[o]ne cannot seek the benefits of equitable relief while flouting the orders of the Equity Court" (see, Vasquez v. Zambrano, 196 AD2d 840, 602 N.Y.S.2d 29; Matter of Coger v. Cusumano, 191 AD2d 493, 495, 594 N.Y.S.2d 332). Moreover, on the basis of defendant's "economic misconduct" alone, a 70%—30% division of marital property is reasonable (see, Conceicao v. Conceicao, 203 AD2d 877, 879, 611 N.Y.S.2d 318).
(Guneratne v Guneratne, 214 AD2d 871, 872-873 [3d Dept 1995]; see also Conceicao v Conceicao, 203 AD2d 877, 879 [2d Dept. 1994] ["Based on defendant's tangled financial records, his gambling activities, his attempted secretion of moneys and his evasiveness, we conclude that defendant has engaged in economic misconduct warranting the 70%—30% division of marital property in plaintiff's favor (see, Weilert v. Weilert, 167 AD2d 463, 464, 562 N.Y.S.2d 139; Contino v. Contino, 140 AD2d 662, 662—663, 529 N.Y.S.2d 14; Blickstein v. Blickstein, 99 AD2d 287, 293, 472 N.Y.S.2d 110)."]).
Separate property, which is an exception to marital property, is construed narrowly (see Fields v Fields, 15 NY3d 158, 163 [2010]). The party claiming that an asset is separate property has the burden of proof on the issue (see DeJesus v DeJesus, 90 NY2d 643, 652 [1997] ["statutory presumption that all property, unless clearly separate, is deemed marital property and must further recognize the titled spouse's burden to rebut that presumption."]; Saasto v Saasto, 211 AD2d 708, 709 [2d Dept 1995] ["A court is not bound by a party's own account of his or her finances, and where a party fails to trace the sources of money claimed to be separate property, the court is justified in treating it as marital property."]).
With respect to retirement accounts, generally that portion of a pension's value that accrues during the marriage constitutes marital property subject to equitable distribution; however, the spouse seeking an equitable share of the participant spouse's retirement account is required to provide proof of the value of the retirement account and absent proof, will not be entitled to a share (see Seckler-Roode v Roode, 36 AD3d 889, 889-890 [2d Dept 2007]). To the extent one party has withdrawn funds from a retirement account after the commencement of a divorce action, the other is entitled to receive a credit for half of that amount (see Iacono v Iacono, 145 AD3d 972, 974 [2d Dept 2016]). With respect to the equitable distribution of real property, the court is required to determine the net equity of the property upon review of a current appraisal report and payoff statements for any liens against the real property (see Donovan v Szlepcsik, 52 AD3d 563, 563-564 [2d Dept 2008]).
"With respect to the allegations of dissipation, a spouse who alleges that the other spouse engaged in waste and dissipation of marital assets bears the burden of establishing such conduct by a preponderance of the evidence (see Solomon v. Solomon, 307 AD2d 558, 561, 763 N.Y.S.2d 141; Strang v. Strang, 222 AD2d 975, 978, 635 N.Y.S.2d 786; Reidy v. Reidy, 136 AD2d 614, 615, 523 N.Y.S.2d 860; cf. Waldmann v. Waldmann, 231 AD2d 710, 647 N.Y.S.2d 827)" (Raynor v Raynor, 68 AD3d 835, 838 [2d Dept 2009]). "Furthermore, even when dissipated funds have no relationship to the value of real property, the wasteful dissipation of assets must be considered in making an award of equitable distribution (see, Baker v. Baker, 188 AD2d 710, 710—711, 590 N.Y.S.2d 603)" (Strang v Strang, 222 AD2d 975, 978 [3d Dept 1995]). 
Based upon the submissions made to this Court, along with the testimony and evidence received at the trial, the Court has determined that Plaintiff was the subject of domestic violence [*36]by Defendant, which has impacted Plaintiff emotionally, financially, and reputationally. Accordingly, as set forth below, the Court has awarded Plaintiff increased percentages of equitable distribution as to certain marital assets. As to the parties' marital assets, the Court directs the following equitable distribution:
1. Lexus NX300 - The Court determines that this vehicle is a marital asset, and the Court awards Plaintiff sole title. To the extent needed to effectuate the terms of this provision, the parties are directed to complete all documents to transfer title to the vehicle into Plaintiff's sole name within 30 days of this Decision and Order, at which time Plaintiff shall be solely responsible for obtaining and paying for any automobile insurance or other carrying costs for the vehicle.
2. Cadillac SUV - The Court determines that this vehicle is a marital asset, and the Court awards Defendant sole title. To the extent needed to effectuate the terms of this provision, the parties are directed to complete all documents to transfer title to the vehicle into Defendant's sole name within 30 days of this Decision and Order, at which time Defendant shall be solely responsible for obtaining and paying for any automobile insurance or other carrying costs for the vehicle.
3. Chevy Volt - The Court determines that this vehicle is a marital asset, and the Court awards Defendant sole title. To the extent needed to effectuate the terms of this provision, the parties are directed to complete all documents to transfer title to the vehicle into Defendant's sole name within 30 days of this Decision and Order, at which time Defendant shall be solely responsible for obtaining and paying for any automobile insurance or other carrying costs for the vehicle.
4. Personal Property & Household Furnishings - Both parties shall have sole interest and title to all personal property currently titled in their names or in their possession with the exception of any directive otherwise set forth within this Decision and Order. With the exception of any family photographs of the parties to which Plaintiff is granted sole title and interest, Defendant is awarded sole title and interest in any tangible personal property and household furnishings, excluding any fixtures (appliances, lighting, etc.), contained within the real properties 1 Lexington and 7 Lexington, which shall be removed by the date Defendant is directed to vacate both real properties and to the extent they shall remain in the real properties, Defendant shall forfeit any ownership, which shall transfer to Plaintiff.
5 Business Interests -
a. [redacted], LLC - The parties have equal interest in [redacted], LLC, ("DR LLC"). Plaintiff testified DR LLC is now defunct and requested authority to close it. The Court finds Plaintiff's testimony credible and grants sole ownership to Plaintiff of DR LLC and all financial accounts of DR LLC, including the authority to wind down DR LLC and execute all necessary documents to effectuate this provision.
b. [redacted]LLC - With the exception of the directives set forth herein pertaining to the [*37]distribution of any specific financial accounts and real properties held by [redacted]LLC, ("[redacted] LLC"), the Court grants sole ownership to Plaintiff of [redacted] LLC and all financial accounts of [redacted] LLC, including the authority to wind down [redacted] LLC and execute all necessary documents to effectuate this provision.
c. Other Business Interests - Plaintiff's testimony included reference to another business that she formed post-commencement but provided no further testimony or evidence pertaining to this business interest. Defendant's testimony include reference to business interests, including reference to a book that he is authoring. Accordingly, the Court awards both parties sole ownership of any other business interests that each may have.
6. United States Treasury Bonds - Although the Court was not presented with any evidence other than the parties' testimony pertaining to their ownership interest in United States Treasury Bonds, the Court takes note of Defendant's testimony that during the course of this litigation, he dissipated Treasury Bonds in an amount of value equivalent to those remaining which he had purchased for Plaintiff during the parties' marriage. Therefore, Plaintiff is hereby awarded sole ownership interest in all United States Treasury Bonds held in either of the parties' names individually or jointly with each other. To effectuate this provision, Plaintiff's counsel shall present any documents necessary for Defendant to execute, which shall be returned fully executed by Defendant within ten (10) days of presentment.
7. 1 Lexington - The Court determines that the real property 1 Lexington is a marital asset to be distributed in the following manner:
a. Valuation - 1 Lexington's fair market value shall be determined by an appraisal report to be prepared by a New York State Licensed Real Estate Appraiser from the Part 36 List being: Anthony F. Navarro, Navarro Realty Group, LLC., [redacted].
b. Listing - 1 Lexington shall be listed for sale at the fair market value set forth in the Appraisal Report, by a New York State Licensed Real Estate Broker from the Part 36 List being: Lucille C. Ettere, Houlihan Lawrence, Inc., [redacted].
c. Carrying Costs - Plaintiff and Defendant shall be equally responsible for all carrying costs associated with 1 Lexington, including, but not limited to, home equity line of credit payments, real estate taxes and property insurance, utilities, snow removal, landscaping, and regular repairs and maintenance. The parties shall cooperate with the Receiver to provide funds for the payment of these expenses and to the extent one party provides funds beyond their respective 50% share of these carrying costs, that party shall be provided reimbursement at closing.
d. Maintenance - Plaintiff shall ensure that the interior and exterior of 1 Lexington is kept clean; signage is placed on the property listing the property for sale to the extent same is permitted by any homeowner association and/or local ordinances; and that a lock box be placed on the property.
e. [*38]Transfer - The parties shall cooperate with the Receiver in the marketing and transfer of 1 Lexington, including, but not limited to: [1] executing any transfer documents; and [2] appearing at a closing.
f. Distribution of Sale Proceeds - The proceeds received from the sale shall be distributed in the following manner and order:
i. Payoff of any mortgages and/or equity lines of credit which encumber the property;
ii. Payoff of any other liens which encumber the property;
iii. Payment of any usual and ordinary transfer expenses (including, but not limited to: title fees, real estate transfer taxes, real estate broker commissions, and real estate attorneys' fees);
iv. Payment of any court-approved fees awarded to the Receiver;
v. Payment of any remaining net proceeds to the parties in the following manner: Plaintiff sixty percent (60%) and Defendant forty percent (40%), in that the Court has found that Defendant has both engaged in domestic violence against Plaintiff and engaged in economic misconduct pertaining to this real property warranting Defendant's decreased equitable distribution with respect to this asset. Receiver shall offset any distribution payable to Defendant to the extent that any obligations of Defendant to Plaintiff exist arising out of this Decision and Order, regardless of if they have been reduced to a money judgment or not.
8. 7 Lexington - The Court determines that the real property 7 Lexington is a marital asset to be distributed in the following manner:
a. Valuation - 7 Lexington's fair market value shall be determined by an appraisal report to be prepared by a New York State Licensed Real Estate Appraiser from the Part 36 List being: Anthony F. Navarro, Navarro Realty Group, LLC., [redacted].
b. Listing- 7 Lexington shall be listed for sale at the fair market value set forth in the Appraisal Report, by a New York State Licensed Real Estate Broker from the Part 36 List being: Lucille C. Ettere, Houlihan Lawrence, Inc., [redacted].
c. Carrying Costs - Plaintiff and Defendant shall be equally responsible for all carrying costs associated with 7 Lexington, including, but not limited to, home equity line of credit payments, real estate taxes and property insurance, utilities, snow removal, landscaping, and regular repairs and maintenance. The parties shall cooperate with the Receiver to provide funds for the payment of these expenses and to the extent one party provides funds beyond their respective 50% share of these carrying costs, that party shall be provided reimbursement at closing.
d. Maintenance - Plaintiff shall ensure that the interior and exterior of 7 Lexington is kept clean; signage is placed on the property listing the property for sale to the extent same is [*39]permitted by any homeowner association and/or local ordinances; and that a lock box be placed on the property.
e. Transfer - The parties shall cooperate with the Receiver in the marketing and transfer of said property, including, but not limited to: [1] executing any transfer documents; and [2] appearing at a closing.
f. Distribution of Sale Proceeds - The proceeds received from the sale shall be distributed in the following manner and order:
i. Payoff of any mortgages and/or equity lines of credit which encumber the property;
ii. Payoff of any other liens which encumber the property;
iii. Payment of any usual and ordinary transfer expenses (including, but not limited to: title fees, real estate transfer taxes, real estate broker commissions, and real estate attorneys' fees);
iv. Payment of any court-approved fees awarded to the Receiver;
v. Payment of any remaining net proceeds to the parties in the following manner: Plaintiff sixty percent (60%) and Defendant forty percent (40%), in that the Court has found that Defendant has both engaged in domestic violence against Plaintiff and engaged in economic misconduct pertaining to this real property warranting Defendant's decreased equitable distribution with respect to this asset. Receiver shall offset any distribution payable to Defendant to the extent that any obligations of Defendant to Plaintiff exist arising out of this Decision and Order, regardless of if they have been reduced to a money judgment or not.
9. Financial & Retirement Accounts - Both parties are awarded sole ownership, title, and interest in any financial and retirement accounts held in title in their respective names, subject to any claims made by the other arising from financial responsibilities set forth in this Decision and Order, with the exception of the financial accounts set forth below which shall be distributed as noted:
a. Fidelity Account Ending in 5287 - Plaintiff provided testimony and presented evidence with respect to Fidelity Account ending in 5287, titled in the name of Plaintiff and Defendant ("Fidelity 5287"). Plaintiff testified that Fidelity 5287 was a marital asset having been funded during the parties' marriage having a balance of $364,373.29 as of December 31, 2020; a balance of $14,863.74 as of May 31, 2023; having been dissipated by Defendant in the amount of $349,509.55 during the pendency of this litigation. The Court determines that this account and the balance in this account of $14,863.74, minus any losses and gains, shall be the sole asset of Plaintiff. The Court further determines that from the dissipated amount of $349,509.55, Plaintiff shall be awarded from Defendant $167,322.90 (calculated in the following manner $349,509.55 by half $174,754.77 less $7,431.87 being half of $14,863.74), which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed [*40]money judgment for the then-unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order.
b. Fidelity Account Ending In 2431 - Plaintiff provided testimony and presented evidence with respect to Fidelity SEP IRA Account ending in 2431, titled in Defendant's name ("Fidelity "2431"). Plaintiff testified that Fidelity 2431 was a marital asset having been funded during the parties' marriage having a balance of $607,797.27 as of December 31, 2020; a balance of $17,693.16, as of July 2023; having been dissipated by Defendant in the amount of $590,104.27 during the pendency of this litigation. Plaintiff further testified that as a result of the parties' Stipulation, she received from Defendant a wire in the amount of $111,132.00 from a SEP IRA. The Court determines that this account and the balance in this account of $17,693.16, minus any losses and gains, shall be Plaintiff's sole asset. The Court further determines that from the dissipated amount of $590,104.27, Plaintiff shall be awarded from Defendant $175,073.55 (calculated in the following manner $590,104.27 by half $295,052.13 less $8,846.58 being half of $17,693.16 less $111,132.00), which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order.
c. Fidelity Account Ending In 7807 - Plaintiff provided testimony and presented evidence with respect to Fidelity IRA Account ending in 7807, titled in Defendant's name ("Fidelity "7807"). Plaintiff testified that Fidelity 7807 was a marital asset having been funded during the parties' marriage having a balance of $582,206.75, as of December 31, 2020; a balance of $0.01 as of April 30, 2022; having been dissipated by Defendant in the amount of $582,206.74 during the pendency of this litigation. The Court determines that this account and the balance in this account of $0.01, minus any losses and gains, shall be Plaintiff's sole asset. The Court further determines that from the dissipated amount of $582,206.74, Plaintiff shall be awarded from Defendant half of the dissipated amount being $291,103.37, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order.
d. Fidelity Account Ending In 3971 - Plaintiff provided testimony and presented evidence with respect to Fidelity Account 3971, titled in Defendant's name ("Fidelity 3971"). Plaintiff testified that Fidelity 3971 was a marital asset having been funded during the parties' marriage and having a balance of $148,608.37, as of December 31, 2020; a balance of ($2,772.17) as of August 31, 2022; having been dissipated by Defendant in the amount of $148,608.37 during the pendency of this litigation, in addition to creating a negative balance of $2,772.17. The Court determines that this account and the negative balance in this account of $2,772.17, minus any losses and gains, shall be the sole liability of Defendant. Plaintiff shall be awarded from Defendant half of the dissipated amount being $74,304.18, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed [*41]money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order.
e. Fidelity Account Ending In 3191 - Plaintiff provided testimony and presented evidence with respect to Fidelity Account 3191, titled in Defendant's name ("Fidelity 3191"). Plaintiff testified that Fidelity 3191 was a marital asset having been funded during the parties' marriage and having a balance of $181,564.01, as of December 31, 2020; a balance of ($5,161.35) as of June 20, 2023; having been dissipated by Defendant in the amount of $181,564.01 during the pendency of this litigation, in addition to creating a negative balance of $5,161.35. The Court determines that this account and the negative balance in this account of $5,161.35, minus any losses and gains, shall be the sole liability of Defendant. Plaintiff shall be awarded from Defendant half of the dissipated amount being $90,782.05, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order and to the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order.
f. Fidelity Account Ending In 5474 - Plaintiff provided testimony and presented evidence with respect to Fidelity Account ending in 5474, titled in Defendant's name ("Fidelity 5474"). Plaintiff testified that Fidelity 5474 was a marital asset having been funded during the parties' marriage having a balance of $352,833.21 as of December 31, 2020; a balance of $30,471.74 as of July 31, 2023; having been dissipated by Defendant in the amount of $322,000.00 during the pendency of this litigation (which the Court calculates to be $322,361.47). The Court determines that this account and the balance in this account of $30,471.74, minus any losses and gains, shall be the sole asset of Plaintiff. The Court further determines that from the dissipated amount of $322,361.47, Plaintiff shall be awarded from Defendant $145,944.86 (calculated in the following manner: $322,361.47 by half $161,180.73 less $15,235.87 being half of $30,471.74), which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order.
g. JP Morgan Chase Account Ending In 1159 - Plaintiff provided testimony and presented evidence with respect to JP Morgan Chase Account 1159, titled in Defendant's name ("Chase 1159"). Plaintiff testified that Chase 1159 was a marital asset having been funded during the parties' marriage having a balance of $235,030.41, as of December 24, 2020; a balance of $5,074.00, as of October 13, 2021; having been dissipated by Defendant in the amount of $230,000.00 during the pendency of this litigation (which the Court calculated to be $299,956.41). The Court determines that this account and the balance in this account of $5,074.00, minus any losses and gains, shall be the sole liability of Defendant. The Court further determines that from the dissipated amount of $299,956.41, Plaintiff shall be awarded from Defendant $147,441.20 (calculated in the following manner: $299,956.41 by half $149,978.20 less $2,537.00 being half of $5,074.00), which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for [*42]the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order.
h. TD Bank Account Ending In 0542 - Plaintiff provided testimony and presented evidence with respect to TD Bank Account 0542, titled in the name of [redacted] Properties, LLC ("TD 0542"). Plaintiff testified that TD 0542 was a marital asset having been funded during the parties' marriage having a balance of $16,303.61, as of March 31, 2022; a balance of $0.00 as of March 14, 2022; having been dissipated by Defendant in the amount of $16,303.61 during the pendency of this litigation. Plaintiff shall be awarded from Defendant half of the dissipated amount being $8,151.80, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order.
i. Fidelity Account Ending In 4277 - Plaintiff provided testimony and presented evidence with respect to Fidelity Account Ending in 4277, titled in Defendant's name ("Fidelity 4277"). Plaintiff testified that Fidelity 4277 had a balance of $265.16 as of December of 2021; a balance of $3,178.47 as of the June 30, 2023; but provided no evidence pertaining to the balance as of the date of commencement. Accordingly, Defendant is awarded sole ownership of Fidelity 4277 and any funds therein.
j. Fidelity Account Ending in 3260 - Plaintiff provided testimony and presented evidence with respect to Fidelity Account Ending in 3260, titled in Defendant's name ("Fidelity 3260"). Plaintiff testified that Fidelity 3260 had a balance of $0.05 as of June 30, 2022; but provided no evidence pertaining to the balance as of the date of commencement. Accordingly, Defendant is awarded sole ownership of Fidelity 3260 and any funds therein.
k. Wells Fargo Bank Account Ending In 9991 - Plaintiff provided testimony and presented evidence with respect to Wells Fargo IRA Account ending in 9991, titled in her name ("Wells 9991"). Plaintiff testified that Wells 9991 has a balance of $24,993.00, as of August 21, 2023, but offered no persuasive evidence that Wells 9991 is not a marital asset. The Court determines that this account is to be distributed with each party receiving a distribution of 50% in the amount of $12,496.50, inclusive of gains and losses from August 21, 2023. To effectuate this provision, the parties shall complete any documents within six months of the date of this Decision and Order, with the understanding that any distribution due to Defendant may be offset by funds due to Plaintiff from Defendant.
l. Wells Fargo Bank Account Ending In 1041 - Plaintiff provided testimony and presented evidence with respect to Wells Fargo IRA Account ending in 1041, titled in Plaintiff's name ("Wells 1041"). Plaintiff testified that Wells 1041 has a balance of $1,240,000.00, as of August 21, 2023, but offered no persuasive evidence that Wells 9991 is not a marital asset. The Court determines that this account is to be distributed with each party receiving a distribution of fifty percent in the amount of $620,000.00, inclusive of gains and losses from August 21, 2023. To effectuate this provision, the parties shall complete any documents within six months of the [*43]date of this Decision and Order, with the understanding that any distribution due to Defendant may be offset by funds due to Plaintiff from Defendant.
m. Wells Fargo Bank Account Ending In 6603 - Plaintiff provided testimony and presented evidence with respect to Wells Fargo IRA Account ending in 6603, titled in her name ("Wells 6603"). Plaintiff testified that Wells 6603 has a balance of $29,712.00, as of August 21, 2023, but offered no persuasive evidence that Wells 6603 is not a marital asset. The Court determines that this account is to be distributed with each party receiving a distribution of fifty percent in the amount of $14,856.00, inclusive of gains and losses from August 21, 2023. To effectuate this provision, the parties shall complete any documents within six months of the date of this Decision and Order, with the understanding that any distribution due to Defendant may be offset by funds due to Plaintiff from Defendant.
n. Wells Fargo Bank Account Ending In 2320 - Plaintiff provided testimony and presented evidence with respect to Wells Fargo IRA Account ending in 2320, titled in Plaintiff's name ("Wells 2320"). Plaintiff testified that Wells 2320 has a balance of $267,185.00, as of August 21, 2023, but offered no persuasive evidence that Wells 2320 is not a marital asset. The Court determines that this account is to be distributed with each party receiving a distribution of 50% in the amount of $133,592.50, inclusive of gains and losses from August 21, 2023. To effectuate this provision, the parties shall complete any documents within six months of the date of this Decision and Order, with the understanding that any distribution due to Defendant may be offset by funds due to Plaintiff from Defendant.
o. Wells Fargo Account Ending In 2585 - Plaintiff provided testimony and presented evidence with respect to Wells Fargo IRA Account ending in 2585, titled in Plaintiff's name ("Wells 2585"). Plaintiff testified that Wells 2585 has a balance of $57,961.00, as of August 21, 2023, but offered no persuasive evidence that Wells 2585 is not a marital asset. The Court determines that this account is to be distributed with each party receiving a distribution of 50% in the amount of $28,980.50, inclusive of gains and losses from August 21, 2023. To effectuate this provision, the parties shall complete any documents within six months of the date of this Decision and Order, with the understanding that any distribution due to Defendant may be offset by funds due to Plaintiff from Defendant.
10. Debts - Both parties shall be solely responsible for any debts held in their respective names, except for the following:
a. Home Equity Line of Credit - The parties shall remain equally responsible for the mortgage currently encumbering the real property located at 1 Lexington Drive, [redacted], which shall be satisfied from the gross proceeds of the sale of this property as set forth herein.
k. Counsel Fees
The Appellate Division Second Department has noted how trial court should determine if an award of attorneys' fees is warranted in a matrimonial action:
In a matrimonial action, an award of attorney's fees is a matter committed to the sound discretion of the trial court, and the issue is controlled by the equities and circumstances of each particular case (see Prochilo v. Prochilo, 165 AD3d 1304, 84 N.Y.S.3d 786; Patete v Rodriguez, 109 AD3d 595, 599, 971 N.Y.S.2d 109). The purpose of Domestic Relations Law § 237(a) is to redress the economic disparity between the monied spouse and the nonmonied spouse by ensuring that the latter will be able to litigate the action on equal footing with the former (see Chesner v. Chesner, 95 AD3d 1252, 1253, 945 N.Y.S.2d 409; Finnan v. Finnan, 95 AD3d 821, 943 N.Y.S.2d 559; Prichep v. Prichep, 52 AD3d 61, 64—65, 858 N.Y.S.2d 667).

 In determining whether to award attorney's fees, the court should review the 
 financial circumstances of both parties, together with all of the other 
 circumstances of the case, including, inter alia, the relative merit of the 
 parties' positions, and whether either party has engaged in conduct or taken 
 positions resulting in a delay of the proceedings or unnecessary litigation 
 (see Prochilo v. 
 Prochilo, 165 AD3d 1304, 84 N.Y.S.3d 786;
 Chesner v. Chesner, 
 95 AD3d 1252, 945 N.Y.S.2d 409; Prichep v. Prichep, 52 AD3d at 
 64—65, 858 N.Y.S.2d 667).
(Brockner v Brockner, 174 AD3d 567, 568 [2d Dept. 2019]).
Plaintiff testified that she entered into a Retainer Agreement with her first attorney for services pertaining to this action and paid that attorney $50,671.84 for the period commencing in Fall 2020 through September 2021. Plaintiff testified that she then entered into a Retainer Agreement with her second attorney for services pertaining to this action and paid that attorney $285,066.35, for the period commencing in September 2021 through September 2023, not inclusive of additional fees she has incurred with her current counsel thereafter. Accordingly, Plaintiffs' legal fees incurred in this action arising out of both her first and second counsel total $335,738.19.
Plaintiff has requested that Defendant pay her legal fees totaling $282,590.56, inclusive of two prior counsel fee awards of $35,000.00 (one of which having been previously reduced to a money judgment) and an additional amount sought of $212,590.56.
The Court has examined the equities and financial circumstances in this case. This Court has also taken note of the parties' conduct throughout the litigation. While Plaintiff has complied with the Court's orders and directives, Defendant has not.
Accordingly, the Court directs that:
1. Defendant's Legal Fees - Defendant shall be solely responsible for all legal fees and litigation costs of this action incurred by him; and
2. Plaintiff's Legal Fees - Defendant shall be responsible for Plaintiff's legal fees incurred by Plaintiff in this matter in the amount of $268,590.68, which shall be payable by Defendant to Plaintiff in the following manner:
a. $35,000.00 payable pursuant to the money judgment entered by the Court on June 13, 2023, and with the County Clerk on June 15, 2023;
b. $35,000.00 with statutory interest from August 26, 2023 pursuant to a proposed money [*44]judgment which shall be submitted to the Court by Plaintiff's counsel.
c. $198,590.68 within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall be permitted to submit a money judgment, noticed for settlement, against Defendant in the unpaid amount. Plaintiff shall be responsible for all other legal fees and litigation costs of this action that she incurred.
1. Use of Prior Sur-Names
In the context of a matrimonial action, trial courts have the authority to grant the parties' request to resume the use of prior pre-marriage names. Based upon the submissions made to this Court, along with the testimony and evidence received at the Irial, both parties may resume the use of any pre-marriage sur-names.
m. Motion Seqence #11
To the extent that the Court has addressed the relief sought by the Receiver within Motion Sequence #11, Motion Sequence #11 is denied entirely as moot.
n. Other Relief
Any relief specifically not granted or otherwise addressed herein is denied.
* * *
Based upon the foregoing, it is hereby
ORDERED that Plaintiff is granted a judgment of divorce against Defendant, dissolving forever the bonds of matrimony existing between Plaintiff and Defendant upon the grounds of the Irretrievable Breakdown of the Relationship pursuant to DRL § 170(7); and it is further
ORDERED that this Court has determined that Plaintiff has met the burden for this Court to determine that Defendant has committed a family offense of disorderly conduct against Plaintiff and this Court shall enter an Order of Protection for the benefit of Plaintiff against Defendant restraining the Defendant for a period of one year which shall terminate on March 20, 2025, in the following manner:
[D.R.] (DOB xx/xx/1954) shall observe the following conditions:
a. Stay away from M.R. (DOB: xx/xx/1953)
b. Stay away from the home of M.R. (DOB: xx/xx/1953)
c. Stay away from the business of M.R. (DOB: xx/xx/1953)
d. Stay away from the place of employment of M.R. (DOB: xx/xx/1953)
e. Stay away from the marital properties of M.R. (DOB: xx/xx/1953), located at 1 Lexington Drive, [redacted], and 7 Lexington Drive, [redacted] as of April 17, 2024.
f. Refrain from communication or any other contact by mail, telephone, e-mail, voicemail, social media or other electronic or any other means, with M.R. (DOB: xx/xx/1953).
g. Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion, unlawful dissemination or publication of intimate image(s) or any criminal offense against M.R. (DOB: xx/xx/1953).
h. Refrain from posting any material, directly or indirectly, on social media, the internet or any other medium that disparages, embarrasses, criticizes, denigrates, or otherwise seeks to interfere with the employment of M.R. (DOB: xx/xx/1953). 

and it is further
ORDERED that within ten (10) days of the Court having entered the Order of Protection for the benefit of Plaintiff, that Plaintiff's counsel shall serve same upon the law enforcement agencies with jurisdictions including the then-residence of Plaintiff and shall file an Affidavit of Service with the Court; and it is further
ORDERED that Plaintiff is granted exclusive occupancy of both real properties located at 1 Lexington and 7 Lexington, which shall begin on April 17, 2024, at which time Defendant is directed to vacate the real properties removing any personal property awarded to Defendant in this Decision and Order. To effectuate the terms of this provision, Plaintiff's counsel shall submit to the Court, on notice of settlement to Defendant, a proposed Warrant of Ejectment, within ten (10) days of this Decision and Order; and it is further
ORDERED that this the entire Court file pertaining to this action shall be sealed; and it is further
ORDERED that Defendant shall immediately upon receipt of this Decision and Order erase all electronically stored medical records of Plaintiff; within ten (10) days of receipt of this Decision and Order turn over to Plaintiff's counsel any hard copies of Plaintiff's medical records; and Defendant shall not seek to obtain Plaintiff's medical records utilizing any health care proxy, HIPAA Authorizations or other documents executed by Plaintiff prior to the commencement of this action; and it is further
ORDERED that Defendant shall be solely responsible for all fees of the Receiver incurred in this action which shall be set and determined by the Court following separate application made by Receiver to the Court on notice to all parties which shall be made and [*45]decided prior to the release of any net proceeds of the sale of the real properties of the parties; and it is further
ORDERED that a separate Order of Appointment of Receiver shall be entered by the Court simultaneously with this Decision and Order that will provide the following: (1) Evan Wiederkehr, Esq., being appointed to act as court-appointed Receiver whose appointment shall remain in effect until such time as he shall submit to this Court an Affirmation of Services setting forth the services completed as Receiver, that all services have been completed, and requesting that this Court approve fees to the Receiver in an amount set forth within the Affirmation and annexed supporting billing statements; (2) Providing a scope of authority of the Receiver to include the following: a. With respect to the real properties known as 1 Lexington Drive, [redacted], and 7 Lexington Drive, [redacted] ("Properties"): i. Engaging in efforts to prepare the Properties for sale, including, but not limited to, completing any renovations and repairs; ii. Engaging in efforts to list the Properties for sale, including, but not limited to, executing any listing agreements and real estate broker agency disclosures; iii. Engaging in any efforts to transfer and covey title, including, but not limited to, deeds and transfer documents. iv. Distributing the funds from the sale of the Properties as set forth herein; and Authorizing the Receiver to file, on notice of settlement to the parties and their counsel, proposed Orders enlarging Receiver's scope of authority to address new issues that may arise following this Decision and Order; and (3) Authorizing the Receiver to file, on notice of settlement to the parties and their counsel, proposed Orders enlarging Receiver's scope of authority to address new issues that may arise following this Decision and Order; and it is further
ORDERED that following the entry of a Judgment of Divorce dissolving the parties' marriage, each party shall be responsible to maintain and pay for his or her own health insurance coverage and all costs associated therewith without contribution from the other party; and it is further
ORDERED that neither party shall receive spousal support or spousal maintenance from the other; and it is further
ORDERED that the Lexus NX300 is a marital asset to which the Court awards Plaintiff sole title. To effectuate the terms of this provision, the parties are directed to complete all documents to transfer title to the vehicle into Plaintiff's sole name within thirty (30) days of this Decision and Order, at which time Plaintiff shall be solely responsible for obtaining and paying for any automobile insurance or other carrying costs for the vehicle; and it is further
ORDERED that the Cadillac SUV is a marital asset to which the Court awards Defendant sole title. To effectuate the terms of this provision, the parties are directed to complete all documents to transfer title to the vehicle into Defendant's sole name within thirty (30) days of this Decision and Order, at which time Defendant shall be solely responsible for obtaining and paying for any automobile insurance or other carrying costs for the vehicle; and it is further
ORDERED that the Chevy Volt is a marital asset to which the Court awards Defendant sole title. To effectuate the terms of this provision, the parties are directed to complete all documents to transfer title to the vehicle into Defendant's sole name within thirty (30) days of this Decision and Order, at which time Defendant shall be solely responsible for obtaining and paying for any automobile insurance or other carrying costs for the vehicle; and it is further
ORDERED that with respect to personal property and household furnishings, both parties shall have sole interest and title to all personal property currently titled in their respective names or in their possession except for any directive otherwise set forth within this Decision and [*46]Order. With the exception of any family photographs of the parties to which Plaintiff is granted sole title and interest, Defendant is awarded sole title and interest in any tangible personal property and household furnishings, excluding any fixtures (appliances, lighting, etc.), contained within the real properties 1 Lexington and 7 Lexington, which shall be removed by the date Defendant is directed to vacate both real properties and to the extent they shall remain in the real properties Defendant shall forfeit any ownership which shall transfer to Plaintiff; and it is further
ORDERED that the Court grants sole ownership to Plaintiff of [redacted], LLC and all financial accounts of [redacted], LLC, including the authority to wind down [redacted], LLC and execute all necessary documents to effectuate this provision; and that within ten (10) days of this Decision and Order, Defendant shall provide to Plaintiff all documents and records pertaining to [redacted]; and it is further
ORDERED that with respect to [redacted]LLC, with the exception of the directives set forth herein pertaining to the distribution of any specific financial accounts and real properties held by [redacted]LLC, ("[redacted]"), the Court grants sole ownership to Plaintiff of [redacted] LLC and all financial accounts of [redacted] LLC, including the authority to wind down [redacted] LLC and execute all necessary documents to effectuate this provision; and that within ten (10) days of this Decision and Order, Defendant shall provide to Plaintiff all documents and records pertaining to [redacted] LLC; and it is further
ORDERED that with respect to any other business interests of the parties, beyond those specifically addressed within this Decision and Order, the Court further awards both parties sole ownership of any other business interests that each may have; and it is further
ORDERED that Plaintiff is hereby awarded sole ownership interest in all United States Treasury Bonds held in either of the parties' names individually or jointly with each other. To effectuate this provision, Plaintiff's counsel shall present any documents necessary for Defendant to execute which shall be returned fully executed by Defendant within ten (10) days of presentment; and it is further
ORDERED that with respect to 1 Lexington, the Court determines this real property to be a marital asset to be distributed in the following manner:
a. Valuation — 1 Lexington's fair market value shall be determined by an appraisal report to be prepared by a New York State Licensed Real Estate Appraiser from the Part 36 List being: Anthony F. Navarro, Navarro Realty Group, LLC., [redacted];
b. Listing — 1 Lexington shall be listed for sale at the fair market value set forth in the Appraisal Report, by a New York State Licensed Real Estate Broker from the Part 36 List being: Lucille C. Ettere, Houlihan Lawrence, Inc., [redacted];
c. Carrying Costs - Plaintiff and Defendant shall be equally responsible for all carrying costs associated with 1 Lexington, including, but not limited to, home equity line of credit payments, real estate taxes and property insurance, utilities, snow removal, landscaping, and regular repairs and maintenance. The parties shall cooperate with the Receiver to provide funds for the payment of these expenses and to the extent one party provides funds beyond their respective 50% share of these carrying costs, that party shall be provided reimbursement at closing;
d. [*47]Maintenance - Plaintiff shall ensure that the interior and exterior of 1 Lexington is kept clean; signage is placed on the property listing the property for sale to the extent same is permitted by any homeowner association and/or local ordinances; and that a lock box be placed on the property;
e. Transfer - The parties shall cooperate with the Receiver in the marketing and transfer of 1 Lexington, including, but not limited to: [1] executing any transfer documents; and [2] appearing at a closing;
f. Distribution of Sale Proceeds — The proceeds received from the sale shall be distributed in the following manner and order: (1) Payoff of any mortgages and/or equity lines of credit which encumber the property; (2) Payoff of any other liens which encumber the property; (3) Payment of any usual and ordinary transfer expenses (including, but not limited to: title fees, real estate transfer taxes, real estate broker commissions, and real estate attorneys' fees); (4) Payment of any court-approved fees awarded to the Receiver; (5) Payment of any remaining net proceeds to the parties in the following manner: Plaintiff sixty percent (60%) and Defendant forty percent (40%), in that the Court has found that Defendant has both engaged in domestic violence against Plaintiff and engaged in economic misconduct pertaining to this real property warranting Defendant's decreased equitable distribution with respect to this asset. Receiver shall offset any distribution payable to Defendant to the extent that any obligations of Defendant to Plaintiff exist arising out of this Decision and Order, regardless of if they have been reduced to a money judgment or not; and it is further
ORDERED that 7 Lexington is a marital asset to be distributed in the following manner:
a. Valuation — 7 Lexington's fair market value shall be determined by an appraisal report to be prepared by a New York State Licensed Real Estate Appraiser from the Part 36 List being: Anthony F. Navarro, Navarro Realty Group, LLC., [redacted];
b. Listing — 7 Lexington shall be listed for sale at the fair market value set forth in the Appraisal Report, by a New York State Licensed Real Estate Broker from the Part 36 List being: Lucille C. Ettere, Houlihan Lawrence, Inc., [redacted];
c. Carrying Costs - Plaintiff and Defendant shall be equally responsible for all carrying costs associated with 7 Lexington, including, but not limited to, home equity line of credit payments, real estate taxes and property insurance, utilities, snow removal, landscaping, and regular repairs and maintenance. The parties shall cooperate with the Receiver to provide funds for the payment of these expenses and to the extent one party provides funds beyond their respective 50% share of these carrying costs, that party shall be provided reimbursement at closing;
d. Maintenance - Plaintiff shall ensure that the interior and exterior of 7 Lexington is kept clean; signage is placed on the property listing the property for sale to the extent same is permitted by any homeowner association and/or local ordinances; and that a lock box be placed on the property;
e. [*48]Transfer - The parties shall cooperate with the Receiver in the marketing and transfer of said property, including, but not limited to: [1] executing any transfer documents; and [2] appearing at a closing;
f. Distribution of Sale Proceeds — The proceeds received from the sale shall be distributed in the following manner and order: (1) Payoff of any mortgages and/or equity lines of credit which encumber the property; (2) Payoff of any other liens which encumber the property; (3) Payment of any usual and ordinary transfer expenses (including, but not limited to: title fees, real estate transfer taxes, real estate broker commissions, and real estate attorneys' fees); (4) Payment of any court-approved fees awarded to the Receiver; (5) Payment of any remaining net proceeds to the parties in the following manner: Plaintiff sixty percent (60%) and Defendant forty percent (40%), in that the Court has found that Defendant has both engaged in domestic violence against Plaintiff and engaged in economic misconduct pertaining to this real property warranting Defendant's decreased equitable distribution with respect to this asset. Receiver shall offset any distribution payable to Defendant to the extent that any obligations of Defendant to Plaintiff exist arising out of this Decision and Order, regardless of if they have been reduced to a money judgment or not; and it is further
ORDERED that with respect to Fidelity Account ending in 5287, the Court determines that: (1) this account and the balance in this account of $14,863.74, minus any losses and gains, shall be Plaintiff's sole asset; (2) Defendant dissipated funds in the amount of $349,509.55, and Plaintiff shall be awarded from Defendant $167,322.90, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then-unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order; and it is further
ORDERED that with respect to Fidelity SEP IRA Account ending in 2431, the Court determines that: (1) this account and the balance in this account of $17,693.16, minus any losses and gains, shall be Plaintiff's sole asset; (2) Defendant dissipated funds in the amount of $590,104.27, and Plaintiff shall be awarded from Defendant $175,073.55, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order; and it is further
ORDERED that with respect to Fidelity IRA Account ending in 7807, the Court determines that: (1) this account and the balance in this account of $0.01, minus any losses and gains, shall be Plaintiff's sole asset; (2) Defendant dissipated funds in the amount of $582,206.74 and Plaintiff shall be awarded from Defendant $291,103.37, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order; and it is further
ORDERED that with respect to Fidelity Account ending in 3971, the Court determines that: (1) this account and the negative balance in this account of $2,772.17, minus any losses and gains, shall be Defendant's sole liability; (2) Defendant dissipated funds in the amount of $148,608.37 and Plaintiff shall be awarded from Defendant $74,304.18, which shall be paid by [*49]Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order; and it is further
ORDERED that with respect to Fidelity Account ending in 3191, the Court determines that: (1) this account and the negative balance in this account of $5,161.35, minus any losses and gains, shall be Defendant's sole liability; (2) Defendant dissipated $181,564.01 and Plaintiff shall be awarded from Defendant $90,782.05, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order; and it is further
ORDERED that with respect to Fidelity Account ending in 5474, the Court determines that: (1) this account and the balance in this account of $30,471.74, minus any losses and gains, shall be Plaintiff's sole asset; (2) Defendant dissipated $322,000.00 and Plaintiff shall be awarded from Defendant $145,944.86, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order; and it is further
ORDERED that with respect to JP Morgan Chase Account ending in 1159, the Court determines that: (1) this account and the balance in this account of $5,074.00, minus any losses and gains, shall be the sole liability of Defendant; (2) Defendant dissipated $299,956.41 and Plaintiff shall be awarded from Defendant $147,441.20, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order and to the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order; and it is further
ORDERED that with respect to TD Bank Account ending in 0542, the Court determined that Defendant dissipated $16,303.61 and Plaintiff shall be awarded from Defendant $8,151.80, which shall be paid by Defendant to Plaintiff within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall have leave of this Court to file, with notice of settlement, a proposed money judgment for the then unpaid amount due Plaintiff from Defendant with statutory interest from the date of this Decision and Order; and it is further
ORDERED that with respect to Fidelity Account ending in 4277, the Court determined that this account and the balance in this account of $3,178.47, minus any losses and gains, shall be the sole asset of Defendant; and it is further
ORDERED that with respect to Fidelity Account ending in 3260, the Court determined that this account and the balance in this account of $0.05, minus any losses and gains, shall be the sole asset of Defendant; and it is further
ORDERED that with respect to Wells Fargo Bank Account ending in 9991, the Court determined that: (1) this account is to be distributed with each party receiving a 50% distribution in the amount of $12,496.50, inclusive of gains and losses from August 21, 2023; (2) to effectuate this provision, the parties shall complete any documents within six (6) months of the date of this Decision and Order, with the understanding that any distribution due to Defendant [*50]may be offset by funds due to Plaintiff from Defendant; and it is further
ORDERED that with respect to Wells Fargo Bank Account ending in 1041, the Court has determined that: (1) this account is to be distributed with each party receiving a 50% distribution in the amount of $620,000.00, inclusive of gains and losses from August 21, 2023; (2) to effectuate this provision, the parties shall complete any documents within six (6) months of the date of this Decision and Order, with the understanding that any distribution due to Defendant may be offset by funds due to Plaintiff from Defendant; and it is further
ORDERED that with respect to Wells Fargo Bank Account Ending in 6603, the Court has determined that: (1) this account is to be distributed with each party receiving a 50% distribution in the amount of $14,856.00, inclusive of gains and losses from August 21, 2023; (2) to effectuate this provision, the parties shall complete any documents within six (6) months of the date of this Decision and Order, with the understanding that any distribution due to Defendant may be offset by funds due to Plaintiff from Defendant; and it is further
ORDERED that with respect to Wells Fargo Bank Account ending in 2320, the Court has determined that: (1) this account is to be distributed with each party receiving a 50% distribution in the amount of $133,592.50, inclusive of gains and losses from August 21, 2023; (2) effectuate this provision, the parties shall complete any documents within six (6) months of the date of this Decision and Order, with the understanding that any distribution due to Defendant may be offset by funds due to Plaintiff from Defendant; and it is further
ORDERED that with respect to Wells Fargo Account Ending in 2585, the Court has determined that: (1) this account is to be distributed with each party receiving a 50% distribution in the amount of $28,980.50, inclusive of gains and losses from August 21, 2023; (2) to effectuate this provision, the parties shall complete any documents within six (6) months of the date of this Decision and Order, with the understanding that any distribution due to Defendant may be offset by funds due to Plaintiff from Defendant; and it is further
ORDERED that both parties shall be solely responsible for any debts held in their respective names, except to the extent that the parties shall remain equally responsible for the mortgage currently encumbering the real property located at 1 Lexington Drive, [redacted], which shall be satisfied from the gross proceeds of the sale of this property as set forth herein; and it is further
ORDERED that with respect to the payment of the parties' legal fees, the Court has determined that: (1) with respect to Defendant's legal fees, Defendant shall be solely responsible for all legal fees and litigation costs of this action incurred by him; (2) with respect to Plaintiff's legal fees, Defendant shall be responsible for Plaintiff's legal fees incurred by Plaintiff in this matter in the amount of $268,590.68, which shall be payable by Defendant to Plaintiff in the following manner: (a) $35,000.00 payable pursuant to the money judgment entered by the Court on June 13, 2023, and with the County Clerk on June 15, 2023; (b) $35,000.00 with statutory interest from August 26, 2023 pursuant to a proposed money judgment which shall be submitted to the Court by Plaintiff's counsel; and (c) $198,590.68 within fifteen (15) days of this Decision and Order. To the extent Defendant fails to comply, Plaintiff shall be permitted to submit a money judgment, noticed for settlement, against Defendant in the unpaid amount; and it is further
ORDERED that Plaintiff shall be responsible for all other legal fees and litigation costs of this action that she incurred; and it is further
ORDERED that both parties may resume the use of any pre-marriage sur-names; and it [*51]is further
ORDERED that to the extent that the Court has addressed the relief sought by the Receiver within Motion Sequence #11, Motion Sequence #11 is denied entirely as moot.
ORDERED that any relief not specifically granted or otherwise addressed herein is denied; and it is further
ORDERED that within ten (10) days of this Decision and Order, Plaintiff's counsel shall file a Notice of Entry of this Decision and Order with proof of service upon Defendant; and it is further
ORDERED that within thirty (30) days of this Decision and Order, Plaintiff's counsel shall submit, with Notice of Settlement or on consent, proposed Findings of Fact and Conclusions of Law, Judgment of Divorce, together with all other ancillary documents needed for the Court to enter a Judgment of Divorce.
The foregoing constitutes the Decision and Order of the Court. 
White Plains, New York
March 19, 2024 
ENTER:
Hon. James L. Hyer, J.S.C.